# 434 SUPREME COURT OF MISSOURI,

## OWEN v. BAER, Appellant.

### In Banc, February 20, 1900.

SEPARATE OPINION BY GANTT, C. J.

1. **Act of 1893 Unconstitutional: CITIES OF FOURTH CLASS: SEWERS BY TWO -THIRDS VOTE: TAX BILLS.** The act of 1893, providing that cities of the fourth class may issue special tax bills in payment of district sewers "when two-thirds of the qualified voters of such city vote in favor" of adopting such provision, is unconstitutional in that it violates the constitutional requirement that "all cities of the same class shall have the same powers and be subject to the same restrictions." The purpose of the Constitution was that the laws enacted for each class should have uniform *operation*. The Legislature was not given the power to pass general laws which nominally confer the same powers on a given class of cities but which inevitably produce diverse powers the moment such laws are put into practical operation. As all cities of the fourth class have not and manifestly will not adopt this enabling provision, it follows that there can not be uniformity of operation or exercise of the power, and hence tax bills issued for the construction of a sewer by one such city which had by a two-thirds vote adopted the enabling act are void.

2. ———: ———: ———: **NEW CLASS OF CITIES.** Said act is also unconstitutional in that it creates a fifth class of cities, to-wit, that class which undertakes to exercise its option to avail itself of the powers thereby given, which necessarily distinguishes them from all other cities of its previous class which do not exercise that option.

SEPARATE OPINION BY SHERWOOD, J.

1. **Constitution: MEANING: DEBATES.** The debates of the Constitutional convention can not safely be resorted to to ascertain the meaning of certain parts of the Constitution.

2. **Stare Decisis: CONSTITUTIONAL INTERPRETATION.** A decision based on the constitution in force at the time it was made, does not establish a binding rule for the construction of a radically different constitution subsequently adopted.

3. **Laws: ENFORCEMENT REFERRED TO PEOPLE.** The enforcement of laws relating to matters of public and general interest, cannot, under the present constitution, be left to a vote of the people of a mere locality.

4. ———: ———: EXPRESSIO UNIUS, ETC.   Where the Constitution expressly provides just when and where a vote of the people may be taken, by so doing it excluded all implications as to authority to vote being granted to the people in any other cases than those mentioned.

5. Amendment of Charters:. PROHIBITION.   The prohibition contained in section 53 of article 4 of the Constitution in relation to amending the charters of cities by passing local and special laws, are absolute prohibitions; they admit of no exceptions and are qualified by none.

### SEPARATE OPINION BY MARSHALL, J.

1. City Charters: PROCEEDINGS IN CONVENTION.   The proceedings and debates in the Constitutional convention of 1875 throw much light upon the true meaning of sections 53 and 54 of article 4, and sections 7, 16, 20 and 25 of article 9, as to the power of the General Assembly to pass general or special laws for the seven classes of cities set forth in the Constitution.

2. Sewers: CITIES OF FOURTH CLASS AND CITIES UNDER SPECIAL CHARTERS: WESTPORT: ACT OF 1893.   The act of 1893, entitled, "An act concerning sewers and drains for cities in the State having special charters, which now or may hereafter contain more than 2,000 and less than 30,000 inhabitants, and for cities of the third and fourth class," and giving such cities power to construct sewers when authorized so to do by two-thirds of the voters thereof, is a general and not a special act, since it "relates to persons or things as a class." Such act is constitutional. It grants the power and the privilege to construct sewers to every city of the class named, equally and in the same terms, and each is given the option to exercise the power conferred or not, as it sees fit. Had the provision for a vote of the people been left out of the act, and the power to provide sewers given to all the cities named in the act, it would clearly have been constitutional, and, hence, its constitutionality is not destroyed by the fact that the option of exercising the power was conferred upon the people rather than on the constituted authorities of such city.

3. Special and General Laws: VOTE OF PEOPLE.   A law which affects the people of the whole State can not be made to depend for its validity, its acceptance, adoption or applicability upon a vote of the people at large, for such a law would be an unauthorized delegation of legislative power; but a permissive or enabling law as to matters of mere local concern, which confers a power or privilege upon such municipalities or localities as vote to adopt or accept the same, is constitutional.

Appeal from Jackson Circuit Court.—*Hon. E. L. Scarritt,*
Judge.

AFFIRMED.

. *C. O. Tichenor* for appellant.

(1) This law applies to all cities of a class, excludes none,
and hence is general. It applies to cities which have special
charters, and which contain, or may contain, a certain popu-
lation. Such cities are recognized by the Constitution, and it
is not necessary to cite authorities to show that a law based on
population may be general. (2) It would seem that the act
did not become unconstitutional until the city took action
under it. Had all the cities of the fourth class voted on a
certain day to build sewers under this act, then the law
would have been constitutional. The law, both as to form
and as to result, would have been such that all the cities would
have possessed the same powers, and would have been subject
to the same restrictions in building sewers. But had one
city voted not to build sewers under this law, this would have
wrecked it. To avoid such a result, there should have been
created a legislative body to pass ordinances for all cities of
each class, so that their action might be uniform. The Con-
stitution does not say that if one city has sewers or paved
streets, all must have them. One can not say that two
cities belong to the same class from their general appearance.
Suppose an act of the legislature gave cities of the first class
the power to build a city hall, a wharf and a waterworks
plant, and to issue bonds therefor upon a two-thirds vote.
One votes to build a wharf, a second a city hall, and a third
a waterworks plant. So soon as the vote was taken, each
could do that it could not have done before, and each could do
that which the others could not do. Each would become
antagonistic to the Constitution, if such an expression can be
allowed. The law in each case was general; applied to each
city of the class; each could act in the same way; each was

restricted in the same way; yet, if a city took the necessary action so as to remove the restriction that was placed upon it by the law, to-wit, building without a vote, then this action recoiled back upon the law, so as to make it unconstitutional. Under a law giving cities of the four classes the right to prohibit saloons, if a majority so voted, one city alone could not do so, because if it did, it would possess a different power from the others. The fallacy of this position is in declaring that the grant of a power is the same thing as the exercise of that power, in accordance with terms of the grant; in holding that if a city, under a provision of law, removes a restriction which rests upon all, and which each and all can remove in the same manner, then the law which gives the right to remove the restriction is unconstitutional. Lynch v. Murphy, 119 Mo. 172; Ward v. Board, 135 Mo. 322; Kirby v. Shaw, 19 Pa. 258; Merchants Bank v. Penn., 167 U. S. 461; Gibson v. Miss., 162 U. S. 565; In re Cleveland, 52 N. J. L. 188; Brown v. Holland, 97 Ky. 249; Hellman v. Shousters, 114 Cal. 136; Paul v. Gloucester, 50 N. J. L. 585.

*Henry Smith, Wash Adams,* and *Hugh C. Ward* for respondent.

(1) That the statute in question is an infraction of section 7, article 9, of the Constitution of Missouri, has been twice adjudicated. Boyd Paving & Contracting Co. v. Ward, 85 Fed. Rep. 27; Ward v. Boyd Paving & Contracting Co., 79 Fed. Rep. 390. These decisions have both been expressly approved by the Supreme Court of Missouri, sitting in banc. St. Louis v. Dorr, 145 Mo. 466. (2) This statute may well be condemned as special legislation. By its terms, the statute applies only to such cities of the third and fourth classes as shall adopt its provisions, giving each city the power to refuse to adopt it, thus disclosing the legislative purpose of applying the statute to a portion of a class. Dividing a class, and ap-

plying legislation to a part only of that class, is incompetent. State v. Buchardt, 144 Mo. 83; State v. Thomas, 138 Mo. 95; State v. Walsh, 136 Mo. 400; Dunne v. Cable R. R., 131 Mo. 1; Appeal Scranton School District, 113 Pa. St. 176; Frost v. Cherry, 122 Pa. St. 417; Commonwealth v. Denworth, 145 Pa. St. 172; Goodrich v. State, 5 Iowa 492; People v. Cooper, 83 Ill. 585; Ward v. Boyd Paving & Contracting Co., 79 Fed. Rep. 390; Louisville v. Kuntz, 47 S. W. Rep. 592.

### SEPARATE OPINION.

GANTT, C. J.—In my opinion the discussion of the previous decisions of this court in the Dorr, Scarritt, Murnane and like cases, is not necessary to the proper disposition of this case.

The Legislature of Missouri, in obedience to the plain constitutional mandate contained in section 7 of article 9 of the Constitution of 1875, provided for the organization and *classification of cities* and towns, and made *four classes.* Westport, by virtue of those laws became a city of the *fourth* class, and was such when the act of 1893 was enacted.

The title of the act of 1893 is as follows: "An Act concerning sewers and drains for cities in the State having special charters which now or hereafter contain more than two thousand and less than thirty thousand inhabitants, and for cities of the third and *fourth class.*" [Laws 1893, p. 101.]

Section 7 of article 9 of Constitution provides that "*the power* of each class" [of cities or towns] "shall be defined by general laws, *so that* all such municipal corporations of the *same* class shall possess the same powers, and be subject to the same restrictions."

This act is one which undertakes to grant powers to cities of the fourth class, which they did not possess under their general statutory charter previous to 1893.

If the act of 1893 had omitted the *proviso* that cities of the fourth class could avail themselves of the power conferred only when two-thirds of the qualified voters of such cities voted in favor of adopting the provisions of the act, no one could doubt that the law was not only a general law, but that it also conformed to the constitutional requirement of legislation by classification.

Has the proviso enabled one or more cities of the fourth class to acquire powers not possessed by others of that class, and thus violated the command of section 7 of article 9 of the Constitution?

The proposition is that because Westport and other cities of the fourth class have voted to avail themselves of the power conferred by this act, whilst other cities of the fourth class have not, or may not elect to do so, the inevitable result is that cities of this same class do not have the same powers, and thereby the prohibited result has been indirectly reached.

It is admitted that the tax bill in this case was issued under the act of 1893 and not under the act of April 11, 1895, which is not open to the objection now being considered.

It must be conceded, I think, that if the act of the Legislature had on its face conferred upon Westport, alone, of all cities of the fourth class, this power to issue special tax bills in payment of district sewers and withheld that power from other cities of the fourth class, it would have been a palpable violation of section 7 of article 9 of the Constitution, which requires that *all cities* of the *same class* shall have the *same powers and be subject to the same restrictions.*"

The purpose of classification would be nullified if the Legislature could take one city out of its class and endue it with powers not granted to all the others. The object to be attained by the seventh section of article nine of the Constitution was well understood when the people adopted that instrument as the organic law of the State. In a word, it was to produce uniformity in the municipal charters of the State, so

that the city officials and citizens alike should know the law applicable to municipal corporations and their limitations, and to prevent a multiplication of charters, each different from the others, and also to relieve the Legislature of a tribe of individual tinkerers who were constantly seeking changes in the charters of various cities and towns, too often for their own personal aggrandizement. Its design was that any citizen or any lawyer whether in or out of the State, who desired to know the powers and restrictions of a given city could ascertain them by reading the general law of the State governing such class.

Section 7 of article 9 of the Constitution was further re-enforced by section 53 of article 4 which placed certain limitations upon the general power of legislation otherwise conferred upon the legislative branch of the State government, and expressly prohibited the Legislature from passing any local or special law "incorporating cities, towns, villages, or *changing their charters.*"

Does this act destroy the uniformity of powers of cities of the fourth class? It is most strenuously insisted that because it is a general act and therefore not a violation of section 53 of article 4 of the Constitution, it is necessarily valid. I agree that it is now too late to disturb the long line of decisions in this State which uphold the power of the Legislature to enact a law which in itself is a complete rule of conduct, but which only becomes applicable in a given county or city when such county or city elects by a vote of its electors to avail itself of the privileges granted by such a law. Such laws have long withstood the objection that they are an unauthorized delegation of the law-making power. [State v. Binder, 38 Mo. 450; Opinion of the Judges, 55 Mo. 295; State ex rel. v. Pond, 93 Mo. 606; Ex Parte Swann, 96 Mo. 44; State v. Moore, 107 Mo. 78; State v. Searcy, 111 Mo. 236; State v. Watts, 111 Mo. 553; State v. Wingfield, 115 Mo. 428.]

If there was no other provision of the Constitution gov-

erning the case in hand, I might well assent to the conclusion that this was a general law when it left the hands of the General Assembly and before any city had exercised its option of availing itself of the said act, but it seems to me with all due respect to my learned brother that the question here is not whether this is a special or general law, but whether conceding that it is otherwise good as a general law, the question remains, does it violate that specific provision of the Constitution found in section 7 of article 9 of the organic law which requires that all cities of the fourth class shall have the *same powers and be subject to the same restrictions*?

It is urged that it is inconsistent to say that it is a general law and yet unconstitutional because it violates section 7 of article 9 of the Constitution, but my understanding is that full force and effect must be given to all parts of the organic law, and while the law may be general in form, still if in another particular it collides with another express provision of the Constitution, there is no inconsistency in holding it invalid because of the latter vice.

In support of the act of 1893 it is said when it left the hands of the Legislature it conferred the same powers upon all cities of the fourth class, but is it not plain that this is true only until such time as one of said cities adopted its privileges, and the moment it availed itself of the act, that instant it became possessed of powers different from others of its class? It is true that if no city of the fourth class ever adopted it no diversity of powers would follow its enactment, but just as soon as Westport or any other city of the fourth class acting for itself chose to avail itself of the privilege granted to construct sewers and make their cost a special improvement tax chargeable upon the individual taxpayers of the designated sewer district, such city brought about that difference in the powers of cities of its class which the Constitution forbade.

Can the Legislature in this indirect way accomplish what the Constitution prohibits it from doing directly?

Such a construction imports an exception into the Constitution which its framers refused to permit. When the Constitution says that all municipal corporations of the *same* class shall have the same powers it means what it says, and not that *all* of the same class shall have the same powers except such as *elect* to have different powers, the Legislature consenting thereto. The limitation was placed on the Legislature and is expressed as clearly as language can define human thought and purpose.

That the result of all legislation for the several classes of cities was the object which the convention had in view is obvious. It says "the power of each class shall be defined by general laws," so that "all municipal corporations of the same class shall have the same powers." In a word; pass general laws for the government of each class, but see to it that when your laws go into effect, the consequence shall be that each class shall at all times have the same powers and be subject to the *same* provisions, that is to say, you shall not go through the form of passing general laws which nominally confer the same powers upon a given class, but which inevitably produce diverse powers the moment such laws are put into practical operation. How can it be said that when this act went into effect in Westport, and did not go into operation in all those cities of the fourth class which declined to avail themselves of it, that it was uniform in all cities of the fourth class. It certainly can not be saved by the suggestion that it was possible for all cities of that class to adopt it and thereby again bring about the uniformity which the adoption by some and neglect to adopt by others had destroyed.

The purpose of the Constitution was that the laws enacted for each class should have uniform *operation*, not uniformity only so long as they should lie dormant and unexecuted. The uniformity of the laws for each class was not to be left to the chance that all of the same class would adopt

them, but the command of the Constitution was and is that the uniformity should be produced by a fixed rule prescribed by the Legislature which would operate alike in every city of the same class.

Such is the construction of similar provisions in other states. Thus in People ex rel. v. Cooper, 83 Ill. loc. cit. 590, 591, Mr. Justice Schofield, speaking for the court said, "We think it necessary to add, that it is the substance, and not the mere form given to the enactment, which must determine its constitutionality. If the act must necessarily produce a result clearly and unquestionably forbidden by the Constitution, it can not be upheld, whatever may be its form or profession. It is not admissible, either by the letter or the spirit of the Constitution, that dissimilarity in character of organization or *powers*, in municipalities of the same class or grade, shall be created or perpetuated by enactments of the General Assembly." See, also, McConihe v. State ex rel. McMurray, 17 Fla. 238; State ex rel. v. Copeland, (Minn.) 69 N. W. Rep. 27.

In my opinion therefore the Act of 1893 is unconstitutional and creates a dissimilarity in the powers of cities of the fourth class, in defiance of section 7 of article 9 of the Constitution, requiring uniformity in the laws governing each class of cities.

Moreover, the Act of 1893, creates a new or fifth class of cities, to-wit, that class which should exercise its option to avail itself of the Act of 1893, and thereby have the powers therein granted and necessarily different from all the other cities of its previous class which did not exercise that option, whereas the Constitution limits the power of the Legislature to the creation of four classes only.

I do not agree to the conclusions my brother Marshall draws from the decisions of this court. I do not agree that the Legislature can pass a special or local act amending the charter of a city as to its municipal affairs by conforming to section 54 of article 4 of the Constitution as to notices, etc.

On the contrary I think section 53 of said article positively prohibits such an act under any circumstances.

Having considered the case as best I could in the time I have had, I think the judgment of the circuit court holding the tax-bills void, should be affirmed. *Robinson* and *Valliant*, *JJ.*, concur in my views.

SEPARATE OPINION.

SHERWOOD, J.—1. I concur in the opinion of Judge MARSHALL as to that unspeakable anomaly in jurisprudence, commonly called the *"Murnane Case."* And while I feel gratified that my views in Dorr's Case, 145 Mo. 466, as to the meaning of certain passages in the Constitution of 1875 are fully supported by the debates of the convention of that year, yet I do not believe that much reliance can be placed on those debates or that they can be safely resorted to in the endeavor to find out what the framers of that instrument meant.

On this point Judge COOLEY observes: "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed. These proceedings therefore are less conclusive of the proper construction of the instrument than are legislative proceedings of the proper construction of a statute; since in the latter case it is the intent of the Legislature we seek, while in the former we are endeavoring to arrive at the intent of the people through the discussions and deliberations of their representatives." [Cooley's Const. Lim. (6 Ed.), p. 81.]

And these remarks are especially true in this instance, as according to the statements of the learned judge, the books in which the records of the debates of the convention have been kept, have been *sealed* books.

2.   And now as to the rule of *"stare decisis,"* and its alleged applicability to the case at bar:

The case (opinion of the Judges) reported in 55 Mo. 295, in relation to township organization, having been decided years before the convention of 1875 was called, I freely confess myself unable to see how that and other like decisions based upon the constitutionality of a law under the *then* constitution, could be the source from whence could be derived the rule which would make those decisions binding under a constitution so radically different as that of 1875 from that of 1865.

Besides, in the case of Lammert v. Lidwell, 62 Mo. 188, WAGNER, J., while approving the rulings on the Township Organization Law, 55 Mo. 295, in which he had concurred, and in State ex rel. v. Wilcox, 45 Mo. 458 on the School Law, in which he wrote the opinion, and State v. Field, 17 Mo. 529; State ex rel. v. Scott, 17 Mo. 521; and St. Louis v. Alexander, 23 Mo. 513, those circumstances are pointed out in which matters may be, and may not be, referred to a vote of the people.   The difference between the former and the latter class of cases consists in this, that in the former the law takes effect, *proprio vigore*, without seeking or requiring any adventitious aids, and is in relation to matters *"purely local and municipal."*   In such case, the vote of the people in favor of granting a license to sell liquor or a petition signed by them for the same purpose and to the same effect, is a mere *permissive incident* not in any manner affecting the validity of the previously enacted and previously operative law which punishes the infractions of its edicts, and only stays its punishing hand when the shield of a legally granted license is interposed.   And the same rule holds good as to the vote (ex-

isting a valid law) for establishing a county, or to prevent stock from running at large, etc., etc.   This view which confines the vote of the people to purely local and municipal matters, and denies its validity as to matters of public and general interest, is upheld in Slinger v. Henneman, 38 Wis. loc. cit. 510, where LYON, J., speaking as the organ of the court, said: "Section 8, however, does not relate to municipal affairs, but it seeks to change a rule of the common law pertaining to a matter of general interest.   As well might the Legislature authorize the board of supervisors of a county to abolish in such county days of grace on commercial paper, or to suspend the operation of the statute of limitations.   Such legislation is clearly within the restriction on the power of the Legislature to delegate its authority, and is therefore inoperative and void."

In State ex rel. v. Scott, supra, GAMBLE, J., clearly pointed out the distinction between acts which may or may not be referred to popular action, by remarking:   "It may be proper, however, to state that it is not by any means clear to the minds of the court that the act under consideration is, or professes to be, a delegation of legislative power.   The establishment of a county, upon the consent of the inhabitants to assume the consequent burdens, is not like the submission of a law affecting private rights to the vote of the inhabitants of a particular locality to determine whether it shall be in force or not."   [State ex rel. v. Scott, 17 Mo. loc. cit. 525].

It was this position which I endeavored to maintain in the Maggard-Pond Case, holding that while the Legislature might in circumstances already cited, authorize a vote to be taken, yet that this could not be done where such vote was to change in a county the general criminal law of this State.   But my efforts were wholly ineffective.

If the people may be authorized by vote to say what shall be the punishment of murder, or what the statute of "Descents and Distributions" in any county, instead of being

governed by general laws as the Constitution contemplates, we should be governed by an infinite variety of local or special laws as variegated as the views of the voters of the different localities where a vote is taken.   But these remarks as to the validity of a vote when taken in certain specified cases as already indicated, are to be taken subject to and qualified by, these additional observations:

The Constitution *specifically provides just when and where a vote of the people may be taken,* and by so doing the framers of that instrument necessarily excluded all implication as to authority to vote being granted to the people, in any other cases than those mentioned.

The doctrine of *expressio unius,* etc., is as applicable to constitutional construction as to statutory, as was contended for by me in State ex rel. v. Seibert, 123 Mo. 424, for the first time in a dissenting opinion.

On this topic, an eminent jurist and author says: "We are not therefore to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves.   If directions are given respecting the times and modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end.   Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to

implication." Cooley on Const. Lim. (6 Ed.), pp. 78, 79, 93, 94.

Touching the same topic, DENIO, C. J., says: "But the affirmative prescriptions and the general arrangements of the Constitution are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government; the grant of legislative power itself; the organization of the executive authority; the erection of the principal courts of justice, create implied limitations upon the lawmaking authority as strong as though a negative was expressed in each instance." [People v. Draper, 15 N. Y. 544. See, also, State ex rel. v. Seibert, loc. cit. 435 et seq.]

And although my contention was vain in that instance, yet in the recent case of Citizens' Nat. Bank v. Graham, 147 Mo. 250, the dissenting opinion on the point mentioned, became that of this court.

This case so recent and so decisive of the point of the applicability of the rule of *expressio unius* would seem to overthrow the doctrine of *"stare decisis"* so far as it relates to the present case. But a more cogent reason for the non-applicability of that rule to this case is afforded by the pregnant and obdurate fact that the point now under consideration, to-wit, the validity of a vote taken where not *expressly* authorized by the Constitution, *never was considered or passed* upon by this court, and of course that point never could fall within the rule, *"stare decisis."*

3.   The prohibitions contained in section 53 of article 4 of the Constitution in relation to amending, etc., the charters of cities by passing local or special laws are *absolute prohibitions*; they admit of no exceptions and are qualified by none. I therefore do not subscribe to the doctrine announced on p. 504 of the opinion under review in the following language: "I further believe that the ends sought to be attained by laws

of this character can be directly and constitutionally reached by any locality, that wants such law, pursuing the methods provided by section 54, article 4, that is, giving the required notice and having a special act passed suitable to the wants of such locality, and which will not apply to other localities that do not desire such regulations," if by such sentence it is meant that the Legislature, prohibited to enact a local or special law as to certain matters, may still do so provided the people of a given locality first give notice and then apply to the Legislature for a *local or special law amending their charter.*

If, on the other hand, the sentence quoted does not mean as above indicated, then I can not subscribe to it because I do not know what it *does* mean.

I regret that my confinement to my room has prevented a more full expression of my views. *Burgess, J.,* concurs herein.

SEPARATE OPINION.

MARSHALL, J.—This case is here on a certificate of the judgment of the circuit court of Jackson county, as authorized by section 2253, Revised Statutes 1889. The printed abstract of the entire record filed by appellant in pursuance to the requirement of that section is as follows:

"This is a suit to remove a cloud from the title of seventeen lots in Vanderbilt Place, an addition to Kansas City, Mo., owned by plaintiff, caused by seventeen tax bills, issued by the city of Westport, Mo., against said lots and to defendant, for the building by him of a sewer, in sewer district number four, within which said lots are located. It alleges that the ordinance of said city for said work was approved August 6, 1895, and that the contract with defendant was dated August 27, 1895, and that the tax bills bear date January 10, 1896.

VOL. 154 mo—29

"Plaintiff charges that said city had no power or authority under the law, either to pass said ordinance or to make or let the said contract, and plaintiff, therefore, further charges that said tax bills are invalid, and in equity should not constitute a lien or demand on said lots, and their existence clouds plaintiff's title, for the reason that their invalidity does not appear upon their face. Plaintiff further states that said tax bills in reality were issued under an act of the General Assembly of Missouri, approved in 1893 (Laws 1893, p. 101), and that said act is unconstitutional, null and void, and plaintiff charges that said tax bills were not issued under the act of said General Assembly, approved April, 1895 (Laws 1895, p. 65)."

The petition alleges Westport to have been, at said dates, a city of the fourth class.

The defendant answered, but it was in the nature of a demurrer. It admits all the allegations of the petition except that charging the Act of 1893 to be unconstitutional and the one charging that the work was not done under the Act of April, 1895, and that Westport voted to build sewers under the Act of 1893, on the 20th of September, 1894.

The case was submitted upon an agreed statement of facts, which, in brief, is as follows:

1. That plaintiff was and is the owner of the lots described.

2. That defendant was and is the owner of the tax bills.

3. That at the dates alleged, Westport was a city of the fourth class.

4. That the tax bills were issued for building a sewer in district number four, and that the lots are in said district.

5. That Westport was divided into sewer districts by ordinance, approved February 27, 1895.

6. That the tax bills are dated January 10, 1896; that

one of them is inserted in this statement to show the form. It is as follows:

### "Special Sewer Tax Bill No. A.

### (Issued under ordinance No. 1373.)

"State of Missouri, City of Westport, ss.

"This is to certify that the following described real estate situated within the corporate limits of the city of Westport, county of Jackson and state of Missouri, to wit: Lot ————, addition ————, has been charged with the sum of ———— dollars, and ———— cents, as a special tax for constructing a sewer for sewer district number four, as provided by ordinance number 1375 of the city of Westport, Missouri, entitled, 'An ordinance to construct sewers in sewer district number four, in the city of Westport, approved August 6, 1895. Said work has been completed under contract let for the purpose by George J. Baer, the contractor to whom this tax bill is issued in part payment thereof, and the sum mentioned has been duly apportioned and charged against the aforesaid land, being one-third of the amount of the special tax against said land as provided by law, for its proportion of the costs of said work, and the same is a lien against said land.

"This tax bill bears interest at the rate of ten per cent per annum from date of issue until paid, and the same is payable on or before one year after said date.

"Issued and certified by me, at the city of Westport, Mo., this 10th day of January, 1896.

"———————— City Engineer."

7.   A copy of the ordinance number 1375, entitled "An ordinance to construct sewers in district number four," and approved August 6, 1895, was incorporated therein.   It is in the usual form for such ordinances and no objection is made

to it in this regard. Section 1 of the same reads as follows: "The municipal authorities of the city of Westport deem the following described sewers for sewer district number four in city necessary for the protection of public health." Section 4 reads as follows: "Said work shall be paid for in special tax bills against and upon the lands in said sewer district number four in the said city of Westport as provided by an act of the General Assembly of the state of Missouri, entitled, 'An act concerning sewers and drains for cities in the State having a special charter which now or hereafter may contain more than 2,000 or less than 30,000 inhabitants, and for cities of the third and fourth classes,' approved March 18, 1893. And in no event and in no manner whatever shall the city of Westport be liable for and on account of the cost of doing the work herein provided for."

A copy of the contract under which defendant did the work was attached thereto; it is in the usual form and no objection is made in this respect. It recites that it was made under ordinance number 1375.

9. A copy of the ordinance approving the said contract, entitled, "An ordinance to confirm contract with George J. Baer for constructing sewer in sewer district number four," Approved September 3, 1895, was submitted.

10. The work was fully completed under said contract by defendant, according to its terms, and afterwards the tax bills were issued.

11. The contractor did his work in good faith and plaintiff, at no time, objected to the doing of the work.

12. The work so done was paid for by tax bills and the tax bills referred to in the petition have never been paid.

The title of the act of 1893, referred to is: "An act concerning sewers and drains for cities in the State having special charters, which now or hereafter contain more than 2,000 and less than 30,000 inhabitants, and for cities of the third and fourth classes."

The first section of the act, which is the only section involved in this case is in the following words:

"Section 1.   In every city in this State having a special charter, which now or hereafter contains more than two thousand and less than thirty thousand inhabitants, and in every city in this State, of either the third class or of the fourth class, the acting municipal authorities thereof, upon a vote by ballot of two-thirds of the qualified voters of such city, voting at an election held for that purpose, in favor of adopting the provisions of this act, shall have power by ordinance to provide drains and sewers for the same, and to enforce and regulate connections therewith. . . . . . . . The proposition to adopt the provisions of this act may be submitted at any regular municipal election, or at a special election authorized by ordinance for that purpose.   In either case the submission shall be pursuant to ordinance, and on not less than ten days' notice thereof, signed by the mayor of such city, and published at least once a week in some newspaper published in the county in which such city is situated, and having a circulation in such city.   Such election shall be conducted in accordance with the law governing regular municipal elections in such city.   The ballots voted in favor of such proposition shall have written or printed thereon the words, 'for establishing sewers,' and the ballots voted against such proposition shall have written or printed thereon the words, 'against establishing sewers.'   When the result of such election shall be ascertained, the same shall be declared by the mayor of such city by proclamation, which shall be spread upon the records of such city, and all courts shall take judicial notice of such elections and of the results thereof."

The circuit court declared the act of 1893 to be unconstitutional, decreed the tax bills to be null and void, and removed the cloud caused by them on plaintiff's property, and the defendant appealed to this court.

The plaintiff contends that the Act of 1893, is unconsti-

tutional for two reasons: *First*, because it is in conflict with section 7 of article 9 of the Constitution of Missouri (1875); and, *second*, because it is in conflict with section 53 of article 4 of that Constitution.

## I.

A chronological and analytical review of the previous pertinent decisions of this court construing the constitutional provisions involved is a proper and necessary preface to the discussion and decision of the case at bar. For a correct appreciation of the reasons given for the results reached in those decisions it is necessary to set out in full these provisions of the Constitution. In the division of the powers of the state among the three branches of government, section 1 of article 4 of the Constitution provides that: "The legislative power, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives to be styled 'The General Assembly of the State of Missouri.'"

Among the limitations thus placed upon the full legislative power vested by this section in the General Assembly, are those enumerated in section 53 of article 4. That section provides: "Sec. 53. The General Assembly shall not pass any local or special law:" [Here follow thirty-two subjects, which are particularly named, as to which the prohibition against special or local laws applies, *inter alia*], "Incorporating cities, towns or villages, or changing their charters;" and the enumeration of specific prohibitions is then followed by the sweeping prohibition that: "In all other cases where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject."

The complement of the meaning of this constitutional

limitation upon the legislative power of the General Assembly, is expressed in section 54 of article 4, which is as follows:

"Sec. 54.   No local or special law shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be affected may be situated, which notice shall state the substance of the contemplated law, and shall be published at least thirty days prior to the introduction into the General Assembly of such bill, and in the manner to be provided by law.   The evidence of such notice having been published shall be exhibited in the General Assembly before such act shall be passed, and the notice shall be recited in the act according to its tenor."

Section 7 of article 9 provides:   "Sec. 7.   The General Assembly shall provide, by general laws, for the organization and classification of cities and towns.   The number of such classes shall not exceed four; and the power of each class shall be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.   The General Assembly shall also make provisions by general law, whereby any city, town or village, existing by virtue of any special or local law, may elect to become subject to, and be governed by, the general laws relating to such corporations."

(1880).   In State ex rel. Lionberger v. Tolle, 71 Mo. 645, it was contended that section 320, Revised Statutes 1879, "which requires the judges of the circuit courts in all cities having over 100,000 inhabitants to award to the newspaper therein being the lowest bidder and having a designated circulation the printing of all legal notices," was special legislation, and therefore unconstitutional, but the court, speaking through Hough, J., said:   "Nor do we think the act in question is a special law within the meaning of the Constitution. The distinction between general and special laws is clearly laid down by the supreme court of Pennsylvania in Wheeler v. Philadelphia, 77 Pa. St. 338, 348.   It is there held, 'that a

statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special,' and that classification does not depend upon numbers." It was further added, in elucidation of another principle to be found in other cases hereinafter referred to: "If the city of St. Louis had been designated by name in the act in question, such act would be regarded as having been passed in pursuance of a special grant of power to the legislature to impose certain duties upon the judges of the St. Louis circuit court, and would fall within the rule laid down in State ex rel. v. Walton, 69 Mo. 558."

(1881). In State v. Kring, 74 Mo. 612, the act of March 26, 1881, which provided that where a change of venue was applied for in the criminal court of St. Louis no special judge should be elected, but the court should request the judge of any other circuit or criminal court to try the case, was attacked as special legislation, and this court, speaking through HENRY, J., said: "The act of 1881 is a special law, applicable to the St. Louis criminal court only, and, therefore, in conflict with the Constitution; section 54 of the 4th article of the Constitution, providing in what manner local legislation may be obtained, has no application, because section 53 is an absolute prohibition of local or special legislation on the subject therein specified." It will be noted that this decision does not harmonize with what was said in State ex rel. v. Tolle, *supra*, as to laws being valid, even if local or special, if passed pursuant to a constitutional mandate, nor does it harmonize with other cases hereinafter referred to, which hold that laws like the act of 1881, therein construed, are not local or special, but general, because the people of the whole state have or may have an interest in the administration of justice in all parts and in every part of the state.

(1882). In State ex rel. Harris v. Herrmann, 75 Mo. 340, the Notary Act of 1881 was challenged as being local and special, because, although it related to the appointment of

notaries in cities having a population of 100,000 inhabitants or over, by its terms it could apply only to such cities as had that population at the date of the passage of the act and never could apply to other cities that in time, by increase of population, might attain that population. SHERWOOD, J., reviewed the decisions in other states which have constitutional limitations similar to ours prohibiting local or special laws, and held the act to be unconstitutional for the reasons claimed. But State ex rel. v. Tolle, 71 Mo. 645, was cited, and expressly approved.

·(1883). In Eyerman v. Blaksley, 78 Mo. 145, it was contended that section 25 of article 6 of the charter of St. Louis, which made special tax bills *prima facie* evidence that the work and material charged in such bill had been furnished, of the execution of the work, of the correctness of the prices charged and of the liability of the person therein named as the owner of the land charged with such bill to pay the same, was a local law, as to St. Louis, and hence violated the provision· of section 53 of article 4, which prohibits the General Assembly from passing any local or special law "changing the rules of evidence in any judicial proceeding or inquiry before courts, justices of the peace, arbitrators or other tribunals." HENRY, J., however, said: "That is an inhibition, not against any change of rules of evidence, but against a change of the rules of evidence with respect to causes pending when the change is made."

This contention treated the charter of St. Louis like a legislative act, and it was so dealt with by the court.

(1884). In Rutherford v. Heddens, 82 Mo. 388, the act of March 28, 1881 (Laws 1881, p. 69), authorizing cities acting under special charters and containing more than 30,000 and less than 50,000 inhabitants to establish, maintain and keep in repair sewers, was claimed to be a special law and hence violative of those provisions of section 53 of article 4, which prohibit the General Assembly from passing any

local or special law "regulating the affairs of counties or cities ....... including cities, towns or villages, or changing their charters, ....... or creating corporations, or amending, renewing, extending or explaining the charter thereof." HENRY J., said: "By section 7 of article 9, the General Assembly is required to provide, by general law, for the organization and classification of cities and towns, the number of classes not to exceed four, and to define the power of each class, and to give to each member of a given class, the same powers, and subject it to the same restrictions as are given to, and imposed upon the other members of that class. Also, to make provision by general law, whereby any city, town, or village, existing by virtue of a special or local law, may elect to become subject to the general law. The legislature has discharged its duty under that section, but the city of St. Joseph has not elected to become subject to the general law, as is the case with many other cities, towns and villages in the State. It is contended by respondent that while in this condition, the charter of the city of St. Joseph can never be amended, not under the general laws, because they can be made applicable only to the four classes established by the constitution and the law, and not by a special law, because the enactment of such laws is forbidden by the constitution ....... Unquestionably the charter of the city of St. Joseph can not be amended by a special law, but, is the act of 1881 a special law?" Then, following State ex rel. v. Herrmann, 75 Mo. 340, the court held that although when the act of 1881 was passed, St. Joseph was the only city in the State existing under a special charter to which the act could apply, still as other cities, existing under special charters, might, in course of time, by increase in population, come within the provisions of the act, and as "legislation is intended not only to meet the wants of the present, but to provide for the future. It deals, not with the past, but, in theory at least, anticipates the needs of a State, healthy with a vigorous development. It is in-

tended to be permanent;" therefore the act of 1881 was a general law and not a local or special act. It will be observed that the point was made, that section 7 of article 9 requires legislation to be both general and by classification, and that it was not passed on directly by the court, but it was assumed that if it was general it need not be by the classification required by section 7 of article 9.

(1884). Ewing v. Hoblitzelle, 85 Mo. 64. Article 2 of the charter of St. Louis provided for registration and elections in that city. The General Assembly, by an act approved March 31, 1883 (Laws 1883, p. 38), provided for registration and elections "in cities having a population of more than one hundred thousand inhabitants."

The act was challenged as special, and hence obnoxious to section 53 of article 4. NORTON, J., said: "No doubt can exist as to the constitutionality of the said act of 1883, in so far as it relates to the registration of voters in cities having a population in excess of 100,000, for by section 5, article 8, of the Constitution, it is expressly declared that 'the General Assembly shall provide by law for the registration of voters in cities and counties having a population of more than 100,000 inhabitants, and may provide for such registration in cities having a population exceeding 25,000 inhabitants, but not otherwise.' This section of the Constitution, in so far as it relates to cities containing more than 100,000 inhabitants, is imperative and mandatory, and the legislature could not refuse to obey the mandate without disregarding a plain duty." Then after holding that the duty to regulate registration carried with it the right to regulate elections, the learned judge said: "It is also insisted by plaintiff that the said act of 1883 is a local and special law, and is, therefore, in contravention of section 53, article 4, of the Constitution, which, among other things, provides that the general Assembly shall not pass any local or special law regulating the affairs of cities, changing the charters thereof, providing the manner of

conducting elections or fixing or changing the place of voting, creating offices, or prescribing the powers and duties of officers in cities. If the premise assumed by counsel that the law in question is a local or special law, be well founded, the conclusion contended for follows necessarily, but we think it has no foundation upon which to rest. The act in question, as we have seen, provides for the registration of voters in cities having more than 100,000 inhabitants, and the power to pass such a law is not only directly conferred by section 5, article 8, of the Constitution, but the General Assembly is expressly required and commanded to pass such a law; and in exercising the power thus conferred, and the duty thus enjoined, the legislature might, as it did, incorporate in the law such a provision as to make its exercise effectual for the purpose intended to be accomplished." State ex rel. v. Tolle, *supra,* and State ex rel. v. Herrmann, *supra,* were cited and expressly approved. It was also contended that sections 20 to 25 of article 9, conferred upon the city of St. Louis sole and exclusive control over all matters of local self government, and hence the act of 1883 was unconstitutional. But it was emphatically held that as section 23 of article 9 provided that "such charter and amendments shall always be in harmony with and subject to the constitution and laws of the state of Missouri," and as section 25 of article 9 provided, "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State," it followed that, while the people of the city were given a constitutional right to frame their own charter, "the idea that it was intended to create a sovereignty, and deny to the State the right of control, is, we think, completely overthrown" by the limitations and conditions set out in sections 23 and 25 of article 9. It was further said: "Public corporations are the auxiliaries of the State in the important business of municipal rule and are called into being at the

pleasure of the State, and the same voice which speaks then into existence can speak them out. [State ex rel. v. Miller, 66 Mo. 328.] And it was never intended by the constitutional provisions above referred to" [secs. 21 to 25, art. 9], "that the municipality of the city of St. Louis should rise higher than the fountain head."

(1890). State ex rel. Attorney-General v. Miller, 100 Mo. 439. In this case the act of March 30, 1887 (Laws 1887, p. 272), which fixed the number of directors in public school boards and provided for their election, "in all cities of this State now having, or hereafter attaining, a population of over three hundred thousand inhabitants," was attacked on the ground, *inter alia*, that it was a local or special law and in conflict with section 53, article 4, which provides that "the General Assembly shall not pass any local or special law ....... regulating the management of public schools, ....... creating corporations, or amending, renewing, extending or explaining the charter thereof ....... In all other cases where a general law can be made applicable, no local or special law shall be enacted." BLACK, J., said: "The general observation made in Wheeler v. Philadelphia, 77 Pa. St. 338, 'that a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special, and comes within the constitutional prohibition,' was approved in Ewing v. Hoblitzelle, 85 Mo. 75, and in State ex rel. v. Tolle, 71 Mo. 650," and after analyzing these cases he added: "The rule that a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things is a special law, is but a statement of a general rule and was only intended as such when laid down in Wheeler v. Philadelphia, *supra*, as will be seen from the context of the opinion. A law which applies to certain school corporations only may be general, or it may be special. Much depends upon the particular matter of which the legislature is treating.

To make such a law general there must be some distinguishing peculiarity which gives rise to a *necessity* for the law as to the designated class. A mere classification for the purpose of legislation without regard to such *necessity* is simply special legislation of the most pernicious character and is condemned by the Constitution. Mere differences which would serve for a basis of classification for some purposes, amount to nothing in a classification for legislative purposes, unless such differences are of a character as in the nature of things, to call for and demand separate laws and regulations."

Then after declaring the act in question to be a general law, and not a local or special one, on the ground that whilst at the time of its passage it could apply only to the city of St. Louis, still it would also apply to any other city in the State that might afterwards attain a population of 300,000, he concluded as follows: "Since there is a growing disposition to evade the prohibitions against special laws, we repeat that peculiarities and differences, which will serve to distinguish persons or things as a class for many purposes, do not necessarily furnish any basis whatever for a legislative classification. To justify such legislation the distinguishing features must be such as to call for and demand a separate rule of statute law."

The difficulty left by this decision is that the *distinguishing features or peculiarities* which can give rise to the *necessity* for an act, are not specified, so that the legislature, or the bar, can understand and observe them, but two acts may be passed in the same terms, relating to different subjects, and one may be held general and the other special, and no one will know which is general and which is special until the Supreme Court says there are *distinguishing peculiarities* which gave rise to the *necessity* for the one and not for tho other.

(1891). State ex rel. Hughlett v. Hughes, 104 Mo. 459. The act of April 11, 1889 (Laws 1889, p. 68), fixing

the terms and places of holding circuit courts in Audrain, Pike, Lincoln and Montgomery counties, was questioned on the ground that it was a local or special law, and that no notice of intention to apply for its passage had been given.

BRACE, J., put the constitutionality of the act upon the ground that it was simply an act passed pursuant to the constitutional mandates, and added: "The due administration of the laws of the State is more largely dependent upon the prompt, proper and efficient exercise of its power, than upon all other governmental agencies. Every citizen of the State is interested in such an administration, not only in the particular locality in which he may happen to reside, but in every nook and corner of the State; for he can not tell in what hour he may need the protection of these laws administered by this tribunal, nor in what part of the State........No law can be either special or local, within the meaning of the Constitution, which results directly or indirectly from a specific constitutional requirement."

(1893). Lynch v. Murphy, 119 Mo. 163, involved the constitutionality of the Act of March 8, 1893 (Laws 1893, p. 150), which amended the act of March 20, 1891, by increasing the dramshop license and requiring two-thirds thereof to be set apart as a special road fund.

BURGESS, J., said: "It is also insisted by counsel for plaintiffs that said acts are in conflict with section 53 of article 4 of the Constitution; that it is a special law; that it regulates the affairs of townships; creates new offices; refunds moneys legally paid into the treasury and grants special privileges. In support of this contention, he relies upon State ex rel. v. Herrmann (75 Mo. 340); but in that case it was expressly said 'that a statute which relates to persons or things, as a class, is a general law, while a statute which relates to particular persons or things of a class, is special.' " And upon the faith of that principle, the act under consideration was held constitutional.

(1893).    State ex rel. v. Wofford, 121 Mo. 61.

The act of March 19, 1881 (incorporated in Revised Statutes 1889, under article 5, chapter 153), providing for the appointment of a court stenographer by the court having jurisdiction in cases of felony "in cities *having* a population of over one hundred thousand," was called in question as being a special· law.

GANTT, P· J., said:    "Now, if as respondent contends, article 5 of chapter 153, Revised Statutes, 1889, was intended to apply to the city of St. Louis alone, and to a state of facts then existing, it was, and is, a special law, and falls within the prohibition of section 53, article 4, of the Constitution of Missouri, but a statute applicable *to all cities* of a certain population is a general law, when it prescribes a rule for future government in all such cities as may, in course of time, reach the requisite population, and is not restricted by its provisions to a state of facts then existing, and not applicable to any other city which may in the future attain that population. [State ex rel. v. Tolle, 71 Mo. 645; Dart v. Bagley, 110 Mo. 42; State ex rel. v. Herrmann, 75 Mo. 340; Wheeler v. Philadelphia, 77 Pa. St. 338.]    Acts of the legislature are to be construed as having a prospective operation unless the contrary is plainly manifest.    Now, there is nothing in this act that restricts it to St. Louis, nor is there a provision in it which would not apply as well to one city of one hundred thousand population as another, hence, the act is not open to the charge of being a special law.    An act which embraces all persons 'who are, or who may come into like situations, and circumstances, is not a special act.' [Humes v. Railroad, 82 Mo. 221.]"    Accordingly the act was held to be unconstitional.

(1894).    State ex rel. Donham v. Yancy, 123 Mo. 391. involved the constitutionality of the act of April 7, 1893 (Laws 1893, p. 133), creating the office of clerk of the criminal court of Greene county, and it was claimed that it was in

conflict with sections 53 and 54 of article 4 of the Constitution.

BURGESS, J., delivering the opinion of the court, held that the act was in no sense special or local, but was an act relating to the administration of the law, in which all the people of the State have an interest, without regard to the location of the court, and was passed pursuant to a constitutional mandate, and added: "Whether an act of the legislature be a local or general law must be determined by the generality with which it affects the people as a whole, rather than the extent of the territory over which it operates, and if it affects equally all persons who come within its range it can neither be special nor local within the meaning of the constitution."

(1894). Murnane v. St. Louis, 123 Mo. 479, involved the constitutionality of the act of March 14, 1893 (Laws 1893, p. 59), relating to the construction of streets in cities of this State that have or may hereafter have a population of 300,000 or more, and it was contended, first, that the charter of St. Louis could not be amended by the General Assembly, in this manner, under section 7 of article 9; and, second, that the act was a local or special law, and therefore in conflict with section 53 of article 4, of the Constitution.

BARCLAY, J., held, 1st, that the act of 1893 did not relate to a subject which concerns the relations of the city to the State; 2d, that the act was not one passed pursuant to a constitutional mandate, but pertained to a matter of strictly municipal regulation; 3d, that in legislating as to cities, the General Assembly must legislate according to the classification required by section 7 of article 9; 4th, that the act of 1893 was a local or special law and hence void under section 53 of article 4.

It must be noted that none of the previous decisions as to what constitutes a local or special law were overruled in terms, and also that the doctrine of legislation as to cities by the classifications prescribed by section 7 of article 9, was

VOL. 154 mo—30

announced for the first time in this State. BRACE and GANTT, JJ., concurred in all parts of the opinion. Thus BARCLAY, BRACE and GANTT, JJ., concurred in the doctrine of legislation by classification, but as they were a minority of the court, it did not establish that doctrine, as the decision of this court. BARCLAY, BRACE, GANTT and MACFARLANE, JJ., and BLACK, C. J., concurred in holding the act to be local or special, and they constituting a majority of the court the decision is properly regarded as resting upon that proposition. SHERWOOD and BURGESS, JJ., dissented.

It must be observed that the doctrine of State ex rel. v. Miller, 100 Mo. l. c. 448, laying down the rule that "there must be some distinguishing peculiarity which gives rise to a *necessity* for the law as to the designated class," is quoted approvingly, and as the majority of the court did not concur in the doctrine of legislation by classification it must be that this act was held to be special because it presented no such *distinguishing peculiarity* that gave rise to such a *necessity*, although the act is in the same general form as the act held to be valid in the Miller case.

(1894).    Kansas City ex rel. v. Scarritt, 127 Mo. 642.

The act of April 1, 1893 (Laws 1893, p. 43), was held in this case to be unconstitutional for two reasons: *first*, because the legislature had no power to amend the charter of Kansas City, which was framed by the people of that city under the authority of section 16 of article 9, in respect of a matter of local municipal government, that section providing that such a charter could be amended by the action of the people of the city, "and not otherwise;" and, *second*, because, legislation for the regulation of "strictly local concerns, must not only be general in form, to comply with the demands of other parts of the constitution (Art. 4, sec. 53), but it must likewise conform to the classification of cities, and of charter powers, prescribed by section 7 of article 9."

BARCLAY, J., referring to section 7 of article 9, said: "The force and scope of this part of the fundamental law were

recently discussed in the Murnane case, 123 Mo. 479, and the opinion was then expressed that the section quoted was intended to limit the power of directly amending the charters of cities (organized since the adoption of the present Constitution) to the mode pointed out in the section last above quoted."

As hereinbefore shown only a minority of the court concurred in this idea in the Murnane case. In this case BRACE, C. J., GANTT, MACFARLANE and ROBINSON, JJ., concurred with BARCLAY, J.; SHERWOOD, J., concurred in reversing and remanding, and BURGESS, J., concurred in the result, but did not wish to be understood as approving the decision in the Murnane case.

This case, therefore, is the first case in this State where the classification of cities required by section 7 of article 9 has been held to be a limitation upon general legislative acts, and this idea is found in no other case except in St. Louis v. Dorr, 145 Mo. 466.

(1895). Dunne v. Kansas City Cable R'y Co., 131 Mo. 1.

In this case the act of April 1, 1891 (Laws 1891, p. 172), regulating the selection of petit jurors in counties in this State "now containing or which may hereafter contain a city having, according to the last preceding national census, more than fifty thousand inhabitants and less than three hundred thousand inhabitants," was attacked as violative of section 53 of article 4.

MACFARLANE, J., said: "Since the adoption of the Constitution containing these limitations upon legislative power this court has passed upon numerous laws to determine whether they fell within the legislation prohibited by this section of the Constitution. In these decisions the distinction between general and special legislation has been very clearly drawn. The governing rule has been 'that a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special.' [State ex rel. v. Tolle, 71 Mo. 650; State ex rel.

v. Herrmann, 75 Mo. 354; Lynch v. Murphy, 119 Mo. 163; State ex rel. v. Marion County Court, 128 Mo. 427.] Numerous statutes relating to cities and counties of a designated population have been upheld, though only one, or a very few cities, or counties, then in existence, fell within the class named. Such legislation is held not to be special for the reason that it applied to all of a class, not alone to those then existing which had the prescribed population, but to all such as might thereafter attain to it. [State ex rel. v. Miller, 100 Mo. 439; State ex rel. v. Bell, 119 Mo. 70.]

"But statutes which were restricted in their application to one or more counties or cities, with no provision by which those subsequently attaining the specified number of inhabitants might enjoy the benefits or powers conferred by the act, have been held to fall under the prohibition. [State ex rel. v. Herrmann, *supra*; State ex rel. v. Wofford, 121 Mo. 68; State ex rel. v. County Court, 89 Mo. 237.]

"But mere form of legislation without regard to its operation will not suffice to relieve it of its special or local character. If in its practical operation it can only apply to particular persons or things of a class, then it will be a special or local law, however carefully its character may be concealed by forms of words. [Murnane v. St. Louis, 123 Mo. 491; State ex rel. v. Herrmann, *supra*.]

"There must also be some distinguishing peculiarity, which gives rise to a necessity for the law as to the designated class. It is said by BLACK, J.,speaking for the entire court: 'A mere classification for the purpose of legislation without regard to such *necessity* is simply special legislation of the most pernicious character and is condemned by the Constitution. Mere differences which would serve for a basis of classification for some purposes, amount to nothing in a classification for legislative purposes, unless such differences are of a character as, in the nature of things, to call for and demand separate laws and regulations.' State ex rel. v. Miller, *supra*,

loc. cit. 449. If the classification is a proper one, the law will not be special or local, though at the time only one object falls within the class, provided the law has such a prospective application as to include all objects that may in the future become entitled to the benefits or powers conferred by the law."

Thus the learned judge embraced in his definition of general or special legislation every doctrine or principle that had been previously enunciated in Missouri, except the necessity for legislation by classification under section 7 of article 9, and concluded by holding the act under consideration unconstitutional.

(1895). State v. Grannemann, 132 Mo. 326.

The validity of the act of March 18, 1895 (Laws 1895, p. 150) prohibiting any person from carrying on the business of barbering on Sunday, was called in question under section 53 of article 4. BURGESS, J., held that a general Sunday law, applicable to all kinds of labor was constitutional, but a law directed against a particular class of labor only, was special, saying: "The object of the constitution is manifest. It was to prohibit special and local legislation and to substitute general law in place of it, wherever, by a general law, the same ends could be accomplished."

(1896). State v. Gritzner, 134 Mo. l. c. 528.

The constitutionality of section 3931 and 3932, Revised Statutes 1889, prohibiting dealing in options, was attacked under section 53 of article 4. SHERWOOD, J., cited and approved the definition of what constitutes general and what special laws, as set out in the Tolle case (71 Mo. 650), and the Herrmann case (75 Mo. 340), and said: "The constitution was intended to be a practical instrument, one for every day's use, and not one which would hamper legislation at every turn, and restrict it in every enactment."

(1896). State v. Walsh, 136 Mo. 400, decides that the pool selling act of March 12, 1895 (Laws 1895, p. 150),

which prohibited pool selling "except on the premises or within the limits or inclosure of a regular race course," violates section 53 of article 4 of the Constitution. SHERWOOD, J., said: "Now it is a rule of long established construction in this State, a rule so well settled that it admits no contravention, 'that a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special.' [State ex rel. v. Tolle, 71 Mo. 650; State ex rel. v. Herrmann, 75 Mo. 340; State v. Julow, 129 Mo. 163.] In the case last cited, it was ruled that while the legislature might legislate in regard to a class of persons, yet that they would not be permitted to take what might be termed a natural class of persons, split that class in two, and then arbitrarily designate the dissevered fractions of the original unit as two classes, and thereupon enact different rules for the government of each."

(1896). State v. Thomas, 138 Mo. 95, declared the pool act of 1891 (Laws 1891, p. 122), which prohibited selling pools on races run outside of this State but did not apply to those run inside of this State, to be a special law, and therefore in conflict with section 53 of article 4, for substantially the same reasons given in the Walsh case, *supra*.

(1897). Kansas City v. Marsh Oil Co., 140 Mo. 458.

In 1885 the General Assembly passed an act (Laws 1885, p. 47), providing a mode of procedure for condemnation of land for municipal purposes, and in 1887 (Laws 1887, p. 37) it amended that act. These acts have been carried into the Revised Statutes of 1889, and appear as section 1815. The law is unquestionably general, and applicable to every city of whatever classification or population. In 1889, Kansas City adopted a charter, pursuant to the provisions of section 16 of article 4 of the Constitution, and some of the details in the mode of procedure in condemnation cases prescribed by that charter were different from the general law (sec. 1815, R. S. 1889.) Kansas City proceeded in this case according to its

charter provisions and it was contended that it should have proceeded under the general law. GANTT, J., said: "A charter is the organic law of a city in this State whether it emanate from the General Assembly, or is framed and adopted by the people of the municipality by authority of the Constitution. Being a law for the government of the municipality, it is binding upon all courts, and it violates no principle of our government to say that the courts, when called upon must enforce these municipal laws unless they conflict with the constitution and laws, and are not in harmony with the Constitution and laws, and, as already said, mere differences in detail do not render such laws inharmonious. So long as Kansas City, under its special charter, does not invade the province of general legislation, or attempt to change the policy of the State as declared in her laws for the people at large, it will not be held to be out of harmony with such laws, notwithstanding the provisions of the special charter may be different from the general statutes prescribed for the government of other cities in their local affairs." Accordingly the proceeding under the charter provision was upheld.

Properly considered this case holds that cities may adopt charters, under section 16 of article 9, but that such charters and all amendments thereto must, in all their essential features, always be in harmony with and subject to the Constitution and laws of the State. And this is the plain mandate of section 16.

1898. St. Louis v. Dorr, 145 Mo. 466.

This case involved the constitutionality of the act of March 26, 1891 (Laws 1891, p. 47), which authorized cities of 300,000 inhabitants or more "or which shall hereafter reach said population" to establish, by ordinance, boulevards. It was contended that the act violated these provisions of section 53 of article 4 of the Constitution which prohibit the General Assembly from passing any local or special law," authorizing the laying out, opening, altering or maintaining roads,

highways, streets or alleys," or "incorporating cities, towns or villages, or changing their charters;" and also that it did not conform to the classification of cities required by section 7 of article 9 of the Constitution.

BARCLAY, J., held the act unconstitutional, for the following reasons: 1st, because it did not conform to the classification of cities required by section 7 of article 9, but would have the effect of dividing cities of the first class into two classes, thus creating five classes of cities, while section 7 permitted only four; 2d, because in Kansas City v. Scarritt, 127 Mo. 642; Kansas City v. Ward, 134 Mo. 172, and Kansas City v. Marsh Oil Co., 140 Mo. 458, it had been held that, "so far as concerns the local affairs of Kansas City, its present charter can not be amended by an act of the Legislature," and "section 25 seems to us to give no sanction to the holding that the charter of St. Louis is subject to amendment by the General Assembly in these particulars wherein the freeholders' charter of Kansas City (for example) is exempt from such amendment ....... The variation of phraseology by the use of the words 'and not otherwise' (in section 16) indicates no difference of intent as to the mode of amendment, when the other parts of that article are considered. The method of direct amendment of the St. Louis charter is obtained by section 22 *and that method is exclusive*; subject, however, to the repeated qualification that the charter of St. Louis and those of all other cities in the State are subject to the Constitution and laws of the State." It was also held that the State could legislate as to matters "which involve the relations of the city to the State," as declared in Tolle's case, Hoblitzelle's case, etc. It was further said: "Legislation on local topics, properly comprehended in municipal charters, must be enacted in the manner defined by section 7, by general laws, the nature of which is indicated explicitly, viz.: 'So that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.' And

the number of classes which the General Assembly may create for the organization of cities and towns is positively limited to four."

Thus the classification doctrine in legislation was again announced, and for the first time the doctrine was stated that notwithstanding the express reservation of power in the legislature contained in section 25 of article 9 of the Constitution the General Assembly could not amend the charter of St. Louis, but that the people of that city had the exclusive right to amend that charter under section 22 of article 9, as it had been held in the Scarritt case that the people of Kansas City had the exclusive right to amend the charter of their city, except always "in respect of those topics which involve the relations of the city to the State."

Hence the act under consideration was declared unconstitutional.

(1899).     Kansas City v. Stegmiller, 151 Mo. 189.

Section 1880, Revised Statutes 1889, provides for the extension of the limits of cities of over 100,000 inhabitants organized under special charters pursuant to section 16 of article 9. This section was amended by the act of 1895 (Laws 1895, p. 54) so as to require the ordinance extending the limits to be in the form of a proposed amendment to the charter to be submitted to the people. Kansas City proceeded in conformity to these statutory provisions and extended its limits so as to take in the city of Westport. The defendant therein, who was the former collector of Westport, refused to recognize the right of Kansas City to the money he had collected for the city of Westport, so the case above styled was instituted. It was contended by defendant, "that the act of the Legislature is void, because special, and creates another class of cities, and is an attempt to amend the charter on a local subject in defiance of the Constitution."

Gantt, C. J., in an opinion in which the whole court, in banc, concurred, except Sherwood, J., who was absent, said:

"It is next contended that the act creates a new class of cities, contrary to section 7, article 9 of the Constitution, which provides that the General Assembly shall provide by general laws for the organization and classification of cities and towns, and that the number of such classes shall not exceed four, and the powers of each class shall be defined by, general laws, and all cities of the same class shall possess the same powers and be subject to the same provisions. It is further provided that the Legislature shall provide by general law whereby any city, town, or village existing by virtue of any special or local law may elect to become subject to and be governed by the general laws relating to such corporations. It is to be observed that the limitation of the number of classes to four applies only to those which the Legislature is authorized to create. On its face it is evident that the framers of the Constitution did not intend to destroy those cities then existing by special or local laws, but expressly gave them the option to continue under their special charters or to 'elect to become subject to and be governed by the general laws relating to such corporations.' Accordingly it has been uniformly held by this court that the charters of these cities existing under laws passed prior to the Constitution of 1875, may be amended by general laws based on population applicable to those cities. [Rutherford v. Heddens, 82 Mo. 338; Rutherford v. Hamilton, 97 Mo. 543; Kelley v. Meeks, 87 Mo. 396.] *Again we think it is plain that the framers of the Constitution ex vi termini excluded from its legislative classification the city of St. Louis, which it expressly authorized to adopt its own scheme and charter, and all such cities as it authorized by section 16, article 9, to frame and adopt their own charters. These cities constitute two constitutional classes distinct from those chartered and classified by the Legislature. It follows that the Legislature may legislate directly for these constitutional cities without infringing the Constitution, and in legislating therefor it does not create a new class but simply*

*provides for a class created by the Constitution* . . . .
As to the other objection that the act was special because con-
fined to those cities only which had over 100,000 at the time
of the passage of the act it is sufficient to say that as to this class
of cities it is an exact copy of the Constitution itself. If
this objection be good it applies as well to the Constitution
itself, and section 16, article 9, became inoperative the moment
it was adopted because it is a fact of which we take judicial
cognizance that at that time St. Louis alone of the cities of
Missouri had a population of over 100,000 inhabitants, but
no one so construes the Constitution. The language of section
16, article 9, is, 'any city having a population of more than
one hundred thousand inhabitants may frame a charter,' etc.
In State ex rel. v. Wofford, 120 Mo. 61, we ruled that a stat-
ute applicable to all cities of a certain population was a general
law when it prescribed a rule for future government in all
such cities as may in the course of time reach the requisite
population, and is not restricted by its provisions to a state of
facts then existing and not applicable to any other city which
may in the future attain that population. This constitutional
provision was designed for the future and permanent govern-
ment of the State. It was prospective in its purpose and so
was the act of 1887 and its amendment in 1895. Its pro-
visions will apply to any other city when it attains 100,000
inhabitants as well as to Kansas City, nor is it at all improbable
that contiguous to such large city may be villages, towns, or
small cities situated as Westport is to Kansas City. We hold
that the law of 1887, as amended by the act of 1895, is not
a special or local law."

This decision wipes out the "classification" doctrine, un-
der section 7, of article 9, as announced in the Murnane,
Scarritt and Dorr cases, and demonstrates that there are seven
classes of cities contemplated by article 9 of the Constitution,
viz.: the four classes that section 7 requires the General
Assembly to divide the cities of the State into; those cities

that at the date of the adoption of the Constitution existed under special charters and which were invited but not commanded to come in under the general laws; cities of over 100,000 that might thereafter frame their own charters under section 16; and the city of St. Louis, which was expressly authorized to be a class unto itself by sections 20 et seq. of article 9.

This decision also demonstrates that the doctrine that acts applicable to cities must not only be general but "must be enacted in the manner defined by section 7" (that is, according to the classification of cities made by the General Assembly pursuant to the command of section 7) would nullify section 16 of article 9 and render it impossible for the Legislature to pass a general law which could apply to those cities organized under section 16. The same would be true as to those cities existing under special charters granted prior to the adoption of the Constitution, and also as to St. Louis. No general law conformed to the classification prescribed by section 7 could apply to any such cities. This decision also clears up much of the confusion which existed as to the validity of laws applicable to cities of a specified population, and properly holds that such laws apply not only to all the cities that had the specified population at the date of the passage of such laws, but also to any city that thereafter attains such a population. This must be true, else a city organized as a city of the fourth class under section 7, could never be governed by a general law applicable to a city whose population classified it as properly belonging to the third or second or first class.

This decision also shows that section 7 was intended solely to classify the cities and was not intended as a limitation upon the form or character of legislative enactments.

Other cases have been decided, in which the question of "special law" was raised, but the acts construed were so manifestly general and in no sense special, that the reasons given

throw no additional light on the propositions here involved, or else the reasons given were so similar to those expressed in the cases here reviewed, that it is deemed unnecessary to refer to them.

The cases reviewed may properly be grouped according to the principles they announce as follows:

1. "A statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special." [State ex rel. Lionberger v. Tolle, 71 Mo. 645; State ex rel. Harris v. Herrmann, 75 Mo. 340; Rutherford v. Heddens, 82 Mo. 338; State ex rel. Attorney-General v. Miller, 100 Mo. 439; Lynch v. Murphy, 119 Mo. 163; State ex rel. v. Wofford, 121 Mo. 61; State ex rel. v. Yancy, 123 Mo. 391; Dunne v. K. C. Cable Ry. Co., 131 Mo. 1; State v. Grannemann, 132 Mo. 326; State v. Gritzner, 134 Mo. 528; State v. Walsh, 136 Mo. 400; State v. Thomas, 138 Mo. 95; Kansas City v. Stegmiller, 151 Mo. 189.]

2. To make a law general it must not only relate to persons or things as a class, but, "there must be some distinguishing peculiarity which gives rise to a necessity for the law." [State ex rel. Attorney-General v. Miller, 100 Mo. l. c. 448.]

3. To make a law general it must not only relate to persons or things as a class, but it "must be enacted in the manner defined by section 7, article 9," i. e., it must conform to the "classification" of cities required by that section. [Murnane v. St. Louis, 123 Mo. 479; Kansas City v. Scarritt, 127 Mo. 642; St. Louis v. Dorr, 145 Mo. 466.] This point was made by counsel in Rutherford v. Heddens, 82 Mo. 388, but was ignored by the court.

4. General laws may be passed changing or amending the charters of cities existing under special laws passed prior to the adoption of the Constitution of 1875. [Rutherford v. Heddens, 82 Mo. 388; Kelley v. Meeks, 87 Mo. 396; Ruther-

ford v. Hamilton, 97 Mo. 543; Murnane v. St. Louis, 123 Mo. 488.]

5.　Laws passed pursuant to an express mandate of the Constitution may be either general or special.　[State ex rel. Lionberger v. Tolle, 71 Mo. 645; Ewing v. Hoblitzelle, 85 Mo. 64; State ex rel. v. Dolan, 93 Mo. 467; State ex rel. Hughlett v. Hughes, 104 Mo. 439; State ex rel. v. Yancy, 123 Mo. 391; State ex rel. v. Higgins, 125 Mo. 364; Kenefick v. St. Louis, 127 Mo. 1; Spaulding v. Brady, 128 Mo. 653.]

6.　The State has a right to enact laws which relate to the purely local affairs of a city, whether the city framed its own charter under a constitutional grant of power or derived its charter from a legislative grant.　[State ex rel. v. Walton, 69 Mo. 556; State ex rel. v. Tolle, 71 Mo. 645; Ewing v. Hoblitzelle, 85 Mo. 64; State ex rel. v. Dolan, 93 Mo. 467.]

7.　The State has no right to amend the charter of a city, by either a general or special law, in matters of purely local concern, which do not affect the relations of the city to the State.　[State v. Kring, 74 Mo. 612; Murnane v. St. Louis, 123 Mo. 479; Kansas City v. Scarritt, 127 Mo. 642; St. Louis v. Dorr, 145 Mo. 466.]

8.　The General Assembly has control over the revenues of a city as well as over those of the counties or of the State, and can direct how they shall be expended.　[State ex rel v. Board of Education, 141 Mo. 45.]

9.　A law applicable to cities of a specified·population is general, notwithstanding at the date of its passage there is only one city in the State with the specified population, if it will in the future apply to any other city in the State that afterwards attains such specified population.　[State ex rel. v. Wofford, 121 Mo. 61; Kansas City v. Stegmiller, 151 Mo. 189.]

10.　General laws applicable to cities need not conform to

Owen v. Baer.

the classification of cities required by section 7 of article 9. [Kansas City v. Stegmiller, 151 Mo. 189.]

11. Legislation in regard to a class of persons is proper, but a natural class can not be split in two and different rules be enacted for each class. [State v. Walsh, 136 Mo. 400; State v. Thomas, 138 Mo. 95.]

Of these cases those embraced in the 2, 3, and 7 groups are no longer the law in this State. The cases collected in the other groups have survived the test of practical experience and correctly declare the law on the subjects treated by them.

## II.

The proceedings and debates. of the convention that framed the Constitution of 1875 throw a flood of light upon the true meaning of sections 53 and 54 of article 4, and sections 7, 16, 20 to 25 of article 9. The record of these proceedings and debates embraces sixty-one volumes of about three hundred pages each, and it is to be regretted that they have never been printed or even indexed, for hid away among their pages, some of which have never been even cut apart since they left the hands of the binder, the true meaning of the framers of the Constitution when they adopted these new provisions of the organic law, is fully expressed and so clearly set forth that if they had been in print much of the uncer² tainty and confusion that has found place in some of the adjudicated cases, construing these sections, would have been avoided, and the General Assembly would have had a sure and safe guide to follow in framing laws touching the subjects they treat of.

It is a surprising fact that article 9, as revised and finally adopted by that convention, has remained among these records with its pages fastened together at the top and side ever since 1875, and that for twenty-four years no one has ever, hitherto, opened them in search of the truths and wisdom they have concealed.

Sections 53 and 54 of article 4 of the Constitution were discussed very fully on the 46th day of the convention. [Proceedings Convention 1875, pp. 83 to 164.] The discussion developed the fact that the Constitution of 1865 (sec. 27, art. 4) had prohibited the General Assembly from passing the special laws therein enumerated, and also from passing any special law where a general law could be made applicable, and that the evils of special legislation intended to be stopped by that provision had not been reached because the Supreme Court had decided that where the legislature had power to legislate it was a question for it to decide whether the end sought could be reached by a general law. Hence it was deemed necessary to insert in the Constitution of 1875 the provision contained in the next to the last paragraph of section 53, making it a judicial question whether a general law could have been made applicable in any case, "without regard to any legislative assertion on that subject."

It was also made plainly apparent by the discussions that it was to be the policy of the Constitution to require general laws to be enacted in all practicable cases and to prohibit special laws in the instances enumerated in section 53, because interested and selfish persons had procured the improvident passage of improper special laws and the localities affected by them had no notice of the proposed laws until after they had become effective statutes. But it was not the purpose to prevent absolutely the passage of local or special laws, for section 54 permitted the passage of some laws if notice of intention to apply therefor was published in the locality to be affected, specifying the substance of the contemplated law. In this way the evil of special laws was intended to be avoided, by having the people notified of the proposed law in ample time to protest against such a law.

This idea is expressed in the address to the people which was adopted by the convention (Proceedings convention, 74th day, p. 28) explaining the Constitution which, speaking of the

legislative department, said: "To afford security against hasty legislation and guard against the possibility of bills becoming laws which have not been fairly and considerately passed ,upon, wholesome resolutions" [regulations] "are thrown around the lawmakers and greater particularity required in the enactment of laws than heretofore. The evils of local and special legislation have become enormous. We need but look back to our session acts to be satisfied that this species of legislation occupies the larger portion of the time of our general assemblies, to the neglect and prejudice of public interest. The expense to the State in passing, publishing such laws and the combinations by which private interests have been advanced and dangerous monopolies created, are well known. Under the proposed Constitution the General Assembly is prohibited from passing such laws. In all cases when a general law can be made applicable, a special one can not be enacted, and in no case can any local or special law be passed, unless notice of the intention to apply therefor shall have been published for thirty days in the locality to be affected thereby."

But as it pertains to the case at bar, much greater light is thrown upon the subject by the proceedings and debates in that convention on the 48th, 72d and 73d days. [Proceedings convention, 48th day, p. 133; proceedings convention, 72d day, pp. 38 to 165; proceedings, 73d day, p. 198.]

Section 7 of article 9 as it now appears in the Constitution is made up of sections 6 and 7 of article 9 as they were reported to and adopted by the convention, and was compressed into one section (section 7) by the revising committee, and finally passed as a revised section. Section 6, aforesaid, was as follows: "The General Assembly shall provide, by general laws, for the organization and classification of cities and towns. The number of such classes shall not exceed four, and the powers of each class shall be defined by general

laws, so that each such municipal corporations of the same class, shall possess the same powers and be subject to the same restrictions." This was adopted by the convention without debate.

Section 7, aforesaid, was as follows: "The General Assembly shall pass no local or special law incorporating any city, town or village, or changing or amending the charter of any city, town or village; but the General Assembly shall make provisions, by general law, whereby any city, town or village existing by virtue of any special or local law may elect to become subject to and governed by the general laws relating to such corporations."

Mr. Shanklin, of Grundy, moved to strike out the first part of the 7th section prohibiting the General Assembly from passing any special law incorporating any city, town or village or changing or amending their charters, pointing out that section 53 of article 4 covered the point. [Proceedings convention, 48th day, p. 134.]

Mr. Black, of Jackson, opposed the amendment, and the amendment was lost (p. 137). But the committee on revision compressed the two sections into one and omitted the part Mr. Shanklin had tried to have stricken out, and changed the phraseology of the last part of the original section 7 from, "but the General Assembly shall make provisions, by general law," etc., so as to read: "The General Assembly shall also make provisions by general law," etc. (p. 198), and in that form it was finally adopted by the convention, and it so appears in the Constitution of 1875.

The greatest light, however, is thrown on sections 53 and 54 of article 4, and on section 7, of article 9, by the proceedings and debates of the convention on the adoption of sections 20 to 25 of article 9, which was the scheme reported by the St. Louis delegation in that convention for the separation of the city and county of St. Louis and for a charter for the city. The scheme as reported by that delegation (now

sections 20 to 25) provided for "the government of the city thus enlarged by a charter in harmony with the Constitution of Missouri." Mr. Hale, of Carroll, moved to amend by adding the words: "Provided that this section shall not be construed to prohibit the General Assembly from amending, altering or repealing said charter so adopted whenever it may be necessary for the public interest." [Proceedings convention, 72d day, p. 46.] He argued that without such a provision the General Assembly would have no power over St. Louis, as it would exist under a charter granted by the Constitution, which could not be amended by the Legislature; that it was not good policy to place St. Louis where she would be independent of the lawmaking power of the State, and that the people of the State would not adopt the proposed Constitution if it did not have such a limitation on the city of St. Louis (72d day, p. 51, 52).

Mr. Gantt, of St. Louis, referred to the provisions (now sections 20 and 23) requiring the charter and amendments to be in harmony with the Constitution of Missouri, and said: "We intended to leave our charter subject to any general law upon that subject which the General Assembly might at any time see fit to enact, and such I think is the plain interpretation of the instrument which we lay before you, but we do wish, Mr. President, not to be disquieted and rendered anxious by an evil which has hitherto worried and pillaged us for thirty or forty years. We are perfectly willing and we remain necessarily subject to the Constitution and general laws of the State, and the General Assembly is prohibited from passing any special law and will be unless we authorize it by the amendment of the member from Carroll. We propose to frame our charter and our government in entire harmony with them, and at any time hereafter the General Assembly by passing a general law may require a modification or repeal if you will" (72d day, p. 54 to 56). Mr. McCabe, of Marion, agreed with Mr. Hale, of Carroll, that the people of

the State would never adopt a Constitution which took St. Louis out of the lawmaking power of the State (72d day, p. 71).

After a debate between Mr. Halliburton, of Sullivan, and Mr. Broadhead, chairman of the St. Louis delegation, as to the power of the General Assembly to amend or repeal by a general law the charter proposed for St. Louis, which the former doubted and the latter contended could be done, under the scheme as it then was (72d day, p. 71), Mr. Adams, of Cooper, offered an amendment to that part of the proposed charter as follows: "The General Assembly shall have the same power over the city and county of St. Louis after the separation as before, and may pass laws for the assessment and collection of revenue and other purposes in such territory as though no such separation had been made" (72d day, p. 71). Mr. Gantt, of St. Louis said he had no objection to the amendment, and Mr. Broadhead said the same, adding, however, that the 4th section (now section 23) covered the same point (72d day, p. 71). Mr. Shanklin, of Grundy, said the charter would have to be in harmony with the laws in existence when the charter was adopted, but he did not know whether the proposed charter would have to be in harmony with laws subsequently enacted (72d day, p. 72). Mr. Broadhead, of St. Louis, said that was also covered by the 4th section (now section 23). Mr. Gantt, of St. Louis, denied that the proposed charter would be a constitutional charter beyond the control of the legislature, and contended that the proposed scheme only provided a different instrumentality for framing the charter, i. e., the freeholders instead of the legislature (p. 74).

Mr. Pulitzer, of St. Louis, said that as far as he was concerned and as far as the people of St. Louis were concerned, as he was advised—he wanted it taken out of the power of the legislature to alter, amend or repeal the charter of St. Louis by any kind of a law; that the proposed charter simply con-

ferred the right of local self government on St. Louis as to matters of purely local concern (pp. 75 to 79).

Mr. Broadhead, of St. Louis, said he was sorry to see the position taken by Mr. Pulitzer, as it gave ground for the apprehensions of the gentleman from Marion, Mr. McCabe (p. 83).

He added that the amendment of Mr. Hale or some such amendment ought to be adopted, for he did not want the city of St. Louis taken out of the law-making power of the State (p. 86), and said, "All I ask is that we shall not give to the General Assembly power by special act to alter or change the charter of the city of St. Louis, but it shall be in accordance with the provisions of general laws" (p. 87).

Mr. Mudd, of St. Louis, offered the following amendment: "Provided that nothing in this article shall be so construed as to exempt said city from the operation of any general law which may be enacted regulating and incorporating cities" (p. 90).

Mr. Hale, of Carroll, said he was not sure the end could be reached by a general law and hence suggested an amendment authorizing the General Assembly to alter, amend or repeal by special law (p. 90).

Mr. Shanklin, of Grundy, said: "If the member will examine the article on legislative department or limitation upon legislative proceedings, he will find the General Assembly has the right to pass any special law it may deem proper where a general law can not be made applicable" (pp. 90, 91).

Mr. Hale said that would not apply to St. Louis as its charter was a constitutional enactment (p. 91).

Mr. Taylor, of St. Louis, said, the proposed charter only authorized the people to frame their own charter instead of having the General Assembly do so, but it was required to be in harmony with the Constitution and laws of Missouri (p. 93).

Mr. Spaunhorst, of St. Louis, said, the purpose was to enable the city of St. Louis to regulate its own internal affairs

and to stop the General Assembly from "tinkering" with its charter (pp. 95, 96).    He also called attention to section 54. article 4, which requires 30 days' notice of a special act and said it was intended to prevent a few individuals from procuring special acts changing the charters of cities (p 97).

Mr. Todd, of St. Louis, said two of the St. Louis delegation were in favor of giving St. Louis a charter that should be subject to and in harmony with the Constitution, not with the laws of Missouri, so as to take it out of the power of the General Assembly to change it (p. 101).

Mr. Fyan of Webster, said he was willing to give St. Louis all she wanted, provided she was held subject to the laws of the State, just as other cities are (p. 109).

Mr. Gottschalk, of St. Louis, called attention to section 7 of article 9, requiring the classification of cities, and said the General Assembly could by general law alter, amend or repeal the charter of St. Louis at any time by passing a law relating to cities of 100,000, which it would call a general law but which would apply only to St. Louis because it was the only city that had 100,000 (pp. 114, 115); he also said that the purpose was to leave St. Louis subject to general laws, but to prevent special laws being passed before the city knew anything about them (pp. 117 and 118); he also called attention to section 53, article 4, "the General Assembly shall not pass any local or special law incorporating cities, towns or villages or changing their charters," and to section 54, article 4, which allows special or local laws to be passed by giving notice (p. 118).

Mr. Hale, of Carroll, asked if section 53 and 54, article 4, applied to the charter of St. Louis (p. 118).

Mr. Gottschalk, answered, "yes" (p. 118).

Mr. Hale expressed doubt (p. 118).

Mr. Gottschalk said the General Assembly could pass a special law changing the charter of St. Louis by giving the notice (p. 119).

Mr. Norton, of Platte, said that as the charter and all amendments must always be in harmony with and subject to the Constitution and laws of Missouri, he did not think the amendment necessary (pp. 121, 122).

Mr. Johnson, of Cole, said, "Disguise this question as we will this proposition amounts to the establishment in the city of St. Louis of a people with the power of local self-government, and that means not only regulating their own local, individual affairs, but regulating those local affairs in their relation with the balance of the State, and the only limitation there is placed upon the city of St. Louis having all the powers of a free and independent government is that their constitution with their ordinances, which are their laws, shall not come in conflict with an express provision of the Constitution or some general law of the State, and I say bringing the rules of strict construction to apply, that any law or any provision of the charter adopted in St. Louis that was not in express conformity with the provisions of the Constitution of this State or some provision of some general law of the State would fail.   Those laws affect us all as well as the residents of St. Louis; we have to go there; we have to do business there and therefore we are subject to their laws and all their regulations. I don't think an experiment of this kind has ever been tried in a republic.   I don't think there has ever been a free city in the world where the laws have not become obnoxious to the people of the State outside of the city" (pp. 122, 123, 124).

He also argued that if the General Assembly had power by general law over St. Louis it ought to have direct power by special law (p. 125).

Mr. Broadhead, replied that a special law would apply only to St. Louis and to no other city in the State and that would be contrary to the provision of section 53 of article 4 (p. 125).

Mr. Johnson, said St. Louis was being made a special

case and the General Assembly ought to have power over it by special act (p. 126). He also called attention to *the fact that St. Louis would not come within the classification of cities required for other cities but was a class unto itself* (p. 126). And added, "I asked in the name of common sense why should the State reach a special evil by a general law when that general law will apply to nothing in the world except the special evil in the city of St. Louis" (p. 127).

Mr. Shanklin, said that under the proposed power the city of St. Louis would be subject to the Constitution and general laws of Missouri, and to such special laws as the legislature might pass after three months notice (p. 130).

Mr. Adams, of Cooper, asked leave to change his amendment so as to read, "Notwithstanding the provisions of this article the General Assembly shall have the same power over the city and county of St. Louis as it has over other cities and counties in this State" (pp. 130, 131).

Mr. Mudd withdrew his amendment (p. 131).

Upon suggestion of Mr. Norton, Mr. Adams offered the above amendment as a substitute to Mr. Hale's amendment (p. 131).

The substitute was adopted by a vote of 51 ayes, 4 noes (p. 132).

Mr. Wagner, of Scotland, moved to amend sections 1 and 4 (now sections 20 and 23) so as to insert after the word "with" the words "and subject to," and after the word "constitution" the words "and laws," so as to make section 1, read, "By a charter in harmony with and subject to the constitution and laws of Missouri," and section 4, to read, "such charter and amendments shall always be in harmony with and subject to the Constitution and laws of Missouri" (p. 133).

Mr. Broadhead, chairman of the St. Louis delegation, accepted the amendment (p. 133), and the scheme for the separation of the city and county of St. Louis, and for a

charter for St. Louis was adopted by a vote of ayes 53, noes 4 (p. 135).

It is a noteworthy fact that the original proposition for the charter of St. Louis, as introduced in the constitutional convention by the St. Louis delegation, provided in section 3 thereof (now sec. 22) that the charter so adopted could be amended by the vote of the voters in St. Louis "and not otherwise," and that Mr. Norton, of Platte, moved to strike out the words, " and not otherwise," and that Mr. Broadhead said there was no objection to striking out those words, but Mr. Taylor of St. Louis objected, and that the motion to strike out was adopted by the convention without division (pp. 137, 138).

Thereupon section 6 of the proposed bill (now section 16, article 9) was taken up. Mr. Priest of Ralls said he understood that (section 6) was intended by the St. Louis delegation as an alternative proposition to enable St. Louis to adopt its own charter if the people did not adopt the scheme proposed in sections 1 to 5 of the bill (now sections 20 to 25 of article 9), (72d day, p. 156).

Mr. Spaunhorst, of St. Louis, said that was partly the intention, but the St. Louis delegation wanted it adopted so that if the people of St. Louis and St. Louis county should vote down the proposition to separate the city and county and the city could not adopt its own charter under section 1 to 5 (now sections 20 to 25) the city of St. Louis could frame its charter under section 6 (now section 16). Mr. Gottschalk and Mr. Taylor, of St. Louis, expressed the same idea (72d day, pp. 158 to 161).

Mr. Crews, of Franklin, moved to amend said section 6, so, as to change it from cities having 200,000 inhabitants, as the section then read, to cities having 100,000 inhabitants, in order that other cities, beside St. Louis, might have the right to frame their own charters, when they attained a population of 100,000.

The amendment was adopted and the section agreed to and it passed into the revised bill as section 16 of article 9 (72 day, p. 165).

It will be observed that the convention was very particular when adopting sections 20 to 25 to keep St. Louis within the lawmaking power of the State, and struck out of section 22 the words, "and not otherwise," so as to exclude the idea that its charter could only be amended by the people of that city, but when section 16 (the alternative proposition originally designed to énable St. Louis to adopt its own charter, if the scheme for the separation of the city and county failed, and subsequently extended so as to apply to any other city that should thereafter come within its scope) was adopted, it failed to strike out the words "and not otherwise." This section, as shown by the remarks of Mr. Priest, of Ralls was not carefully considered by the convention, because the members thought if sections 20 to 25 were adopted, St. Louis would not ask for the adoption of this alternative scheme. Hence those words remained in section 16. But it is clear, from what was said and done in the convention, that the members of that convention did not intend to allow cities organized under that or any other section to be beyond the legislative control of the State, and all the St. Louis delegation, except Mr. Pulitzer and Mr. Spaunhorst, that had framed both the schemes, expressly disclaimed that such was the intention or true meaning of those words. This is shown by the remarks of Mr. Broadhead, Mr. Gantt, Mr. Mudd, Mr. Todd, Mr. Taylor and Mr. Gottschalk, of the St. Louis delegation, and is proved to be the intention of the convention by the remarks of Mr. Hale, Mr. McCabe, Mr. Halliburton, Mr. Adams, Mr. Shanklin, Mr. Fyan, and Mr. Johnson, above set out, and by the fact that when the vote on the motion to strike those words out of section 22 was taken, it was carried without division. In short the scheme of divorcing any city from the control of the State, in respect to any matter, whether in respect to its

relations towards the State or in respect to matters of purely local concern, was advocated by only Mr. Pulitzer and Mr. Spaunhorst, and emphatically repudiated by all the other members of the convention who spoke on the subject, and finally rejected on a vote without a dissenting voice so far as the record shows.

Moreover it is clear, as shown by the speeches of Mr. Broadhead, Mr. Gantt, Mr. Todd, Mr. Taylor and Mr. Gottschalk, all eminent lawyers, that the words, "and not otherwise," can not be properly construed into meaning that such charters could not be amended by general laws (or by special laws passed after notice given, as provided by section 54 of article 4) enacted by the legislature, and that they are mere words of limitation upon the power of the people of such cities to amend their own charters; that is, that the people could amend the charter by a three-fifths vote and not otherwise; or in other words that the charter could not be otherwise amended by the people than by a vote of three-fifths of the people. · The power of the State to amend such charters is nowhere referred to directly or indirectly in section 16.

These excerpts from the proceedings and speeches of the convention that framed the Constitution of 1875 prove that the framers of the Constitution intended, especially by sections 53 and 54 of article 4, and sections 7, 16, 20 to 25 of article 9, to accomplish the following purposes:

1. To abolish the evils of special legislation, procured by private persons at the expense of the public interests and without notice.

2. To require all laws, as far as practicable to be general, so as to apply alike to all persons or things of a class. Thereby insuring greater care, deliberation and discrimination in the passage of a law, and putting the representatives from every part of the State upon the alert when any law was to be passed.

3. To allow local or special laws to be passed only after

notice of their purport and of intention to apply for the same was published in the locality to be affected for thirty days before the bill was introduced in the ligislature.

4.   To abolish the granting by the general assembly of special charters to cities and to require the General Assembly to provide for four classes of cities, thereafter to be organized, and to provide for their government by general municipal corporation laws, so that all cities of the same class should be governed by the same laws.

5.   To permit cities theretofore chartered by special acts to continue to exist under such charters, and to invite them but not compel them to come in under the general municipal corporation laws.

6.   To permit the city and county of St. Louis to separate, by a vote of their people, and to authorize the people of St. Louis to adopt a charter for their own government, but to require that such charter and all amendments thereafter adopted by the people should always be in harmony with and subject to the laws of Missouri, in respect to the relations of the city to the State and in respect to matters of purely local concern, which might then be in existence or which the general assembly might thereafter at any time enact in a general form or in a special form after notice.

7.   To permit St. Louis, if the scheme for the separation of the city and county failed to be adopted by those people, to frame its own charter, and also to permit any other city, organized under a prior special law or under the general municipal corporation laws, enacted by the General Assembly under the mandate of section 7, that might at any time thereafter have a population of 100,000 inhabitants, to frame its own charter, with the right to the people to amend the same, at any time, if three-fifths of the people of such city voted in favor of the amendment, and not otherwise by the people, but to be at all times a part of the State of Missouri, subject to the general laws enacted by the lawmaking power of the

State and applicable to it, and also to special laws passed pursuant to section 54 of article 4.

Thus it will appear, from even a casual examination, that the results reached by this court in the groups of cases aforesaid that have survived the test of experience, and the purposes shown to have been intended by the framers of the Constitution, are identically the same. And considering that those results have heretofore been reached by the judiciary without the aid of the purposes expressed by the framers of the Constitution, it is not only somewhat surprising but extremely flattering.

## III.

In the light of the foregoing nothing more need be said about what constitutes a general and what a special law.

It is proper to add, however, that general laws applicable to municipal corporations could not be framed in accordance with the four classes of cities required by section 7, article 9, for the reason that there are *seven* classes of cities recognized and authorized by article 9: 1st, cities that existed under special laws passed prior to 1875; 2d, the four classes of cities required by section 7; 3d, the city of St. Louis, organized under sections 20 to 25; 4th, cities organized under section 16.

If the legislature was limited, in passing general laws, to the classification of cities required by section 7, it is demonstrably true that no general laws could be passed which could apply to cities organized under special acts prior to 1875, or to St. Louis, or to cities organized under section 16, for they do not, could not, and were not intended to come within the four classes required by section 7. The result would be that no general law could be passed which would apply to those three classes of cities, and yet it was the declared prime purpose of the Constitution that only general laws should be

enacted when practicable. The further result would be presented, that the General Assembly could enact general laws as to the four classes of cities organized under section 7, but could only enact special laws applicable to the other three classes of cities, or else that it could not enact any kind of a law, general or special, applicable to those three classes of cities not covered by section 7; and those cities would be "free cities" outside of state control. Yet the framers of the Constitution expressly disclaimed any intention of permitting any city to be beyond the State's control in any respect whatever, saying the people of the State had an interest in every locality in the State, and that while cities might be allowed to frame their own charters they must always be in harmony with and subject to the Constitution and laws of Missouri, then existing or thereafter enacted under the Constitution.

Neither is there any longer any room for the contention that as to mere matters of local concern or in matters not pertaining to the city's relation to the State, a city is beyond legislative control. This was the idea advanced by Mr. Pulitzer and Mr. Spaunhorst in the constitutional convention of 1875, and repudiated by that convention by a vote of 53 to 4 (Proceedings, 72d day, p. 135).

And this is necessarily true, as it is easy to show. A city derives all its powers, expressly or incidentally or by implication, from the charter granted to it by the State. It is a creature of the State and can never be greater than its creator. Prior to 1875 those charters were granted by special acts of the legislature. Since then those organized under section 7 get their charters under the general municipal corporation laws enacted by the legislature. In whichever way they derive their powers, the law passed by the General Assembly must specify regulations for all those matters respecting the relation of the city to the State, and also for all those

matters which are of only local concern, for without such regulations or grants of powers, express or implied, the city would have no power. The legislature, either specially before 1875 or generally since 1875, therefore gives the city all the power it has. If any city organized under special law prior to 1875 or under the general law since 1875 finds it needs more power or a change of power, in respect to matters relating to its duty to the State or in respect to matters of purely local concern, it must apply to the General Assembly to amend or change its special charter by a general law applicable to all cities similarly situated or to change the general law passed under section 7, article 9, applicable to a city of its class and the legislature alone has power to do so. In short, as to these five classes of cities all regulations and laws relating to every thing the city does or can do, are made and can only be changed by the legislature.

This being true it can not fairly be said, in view of what was said and done by the framers of the Constitution, that it was intended that the legislature should and might and alone could amend the charters of those five classes of cities in any respect, whether it pertained to matters of local concern or not, but could not by general or special law amend the charters of cities organized under section 16, or of the city of St. Louis, in matters of purely local concern, for such a construction would take such cities out of the control of the State, which the framers of the Constitution expressly refused to permit, and would divide the cities of the State into two classes, where they are naturally only one in respect to being under State control. The Constitution intended, and this court has decided (cases cited in 4, 6, 8 groups *ante*) that all charters of all cities, however organized, can be amended, and that local affairs, even as to how local revenues shall be expended by the city, can be controlled by proper laws passed by the General Assembly.

## V.

Measured by these principles and proceedings the act of March 18, 1893 (Laws 1893, p. 101), is a general and not a special act, for it applies to all cities having a special charter and that now have or may hereafter contain a population of more than 2,000 and less than 30,000 inhabitants and also to all cities of either the third or fourth class, and hence comes within the principles of the first group of cases, *ante*.

The act is not invalid because it does not conform to the classification of cities required by section 7, article 9, for the legislature is not limited to that classification in enacting laws (for that would be impracticable and impossible), but it may legislate by general laws, so as to embrace all cities however organized or chartered or so as to embrace any class of cities authorized by the Constitution either singly or in groups, for such laws relate to a natural, constitutional class. By the term "general laws" here employed is meant laws which may in time apply to any locality that may come within their scope.

## VI.

This leaves for consideration the last and most difficult question in this case. The act of 1893 provides that it shall apply to such of the specially chartered cities having the specified population and to such of the cities of the third and fourth classes, as shall, by a two-thirds vote of its qualified voters, vote, "in favor of adopting the provisions of this act."

It is argued that this violates the provision of section 7, article 9, which requires, "that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions;" in this, that if some of the designated cities vote to adopt the provisions of the act and others do not, all of the cities of the designated class will not possess the same powers and be subject to the same restrictions. And

it was for this reason that this act was held unconstitutional by PHILIPS, J., in Ward v. Boyd Paving & Construction Co., 79 Fed. Rep. 390, and by SANBORN, J., in Boyd Paving & Construction Co. v. Ward, 85 Fed. Rep. 27.

This reasoning, whatever may be said of it as regards cities of the third and fourth classes, manifestly has no application to cities existing under special charters granted prior to 1875, for section 7 of article 9 does not deal with them, further than to invite them to come in under the general laws, nor was it intended or required by any provision of the Constitution that the charters of such specially chartered cities should be alike, or that all such cities should be possessed of the same powers or be subject to the same restrictions. This court has decided in the 4th group of cases, *ante*, that the General Assembly can amend the charters of such specially chartered cities, and this principle is admitted even in the cases which announced the necessity for legislation by classification under section 7 (St. Louis v. Dorr, 145 Mo. l. c. 483; Murnane v. St. Louis, 123 Mo. l. c. 488) although it is not stated in those cases by what logic this can be done as to specially chartered cities when it is denied that it can be done as to other cities specially chartered under other constitutional provisions and which can no more be brought within the classification of cities required by section 7, than the cities which were specially chartered prior to 1875.

The act of 1893 is, therefore, not in conflict with section 7 of article 9, as it applies to cities specially chartered prior to 1875.

There is force in the contention as applied to cities of the third and fourth class, but when closely analyzed it will be seen that the argument is not tenable if the previous decisions of this court are to be adhered to. It has been held that it is competent for the legislature to enact a law, which is a complete rule of conduct, but which shall apply to only such localities as vote to have it apply to such localities. [State v.

Searcy, 20 Mo. 489 (Liquor law); St. Louis v. Alexander, 23 Mo. 483 (Stock subscription law); State v. Binder, 38 Mo. 450 (Sunday law); Opinion of Supreme Court Judges on Township Organization law, given to House of Representatives, January, 1874, 55 Mo. 295; Lammert v. Lidwell, 62 Mo. 188 (Stock law); State ex rel. v. Wilcox, 45 Mo. 458 (School law); State ex rel. v. Hudson, 78 Mo. 304 (Dramshop law); State ex rel. v. Pond, 93 Mo. 606 (Local Option law); Ex parte Swann, 96 Mo. 44 (Local Option law); State v. Moore, 107 Mo. 78 (Local Option law); State v. Searcy, 111 Mo. 236 (Local Option law); State v. Watts, 111 Mo. 553 (Local Option law); State v. Wingfield, 115 Mo. 428 (Local Option law)]. The ground upon which these cases rest is that the act is a general law made for the whole State and takes effect from its passage; that the option given to the people does not create the law, but only affects the taking effect or application of the law; that a law may be made to take effect upon the happening of a contingency or condition subsequent, and that a vote of the people is such a contingency or condition. The contrary doctrine was decided in State v. Buchardt, 144 Mo. l. c. 85, by Division No. 2, of this court, GANTT, P. J., dissenting; and also in City of St. Louis v. Russell, 116 Mo. 248.

The crucial question in this case therefore is whether the act of 1893 violates the Constitution because it contemplates that it shall apply in only such of the designated cities as vote to adopt the provisions of the act.

The identical question was extensively debated in the Constitutional Convention of 1875.

When section 53 of article 4 was under consideration, Mr. Edwards, of Iron, moved to amend the last paragraph so as to insert after the prohibition against enacting a special or local law by the partial repeal of a general law, the words, *"or enact a general law which by its provision is to be in force and effect only in such counties as first by a vote of the people*

*at an election held for that purpose may vote to adopt the same.*"
In support of the amendment he said that his experience as a
legislator showed that the General Assembly passed such laws,
and that they were a mere evasion of the prohibition against
special laws, and he instanced the stock law (46th day, p.
110).

Mr. Nickerson, of Johnson, objected to the amendment
because it would affect the township organization laws.   A
vote was then taken and the amendment was adopted (46th
day, p. 111).   Afterwards a motion to reconsider was intro-
duced and prevailed (46th day, p. 127).   The amendment
was then considered very fully.   Mr. Wagner, of Scotland,
supported the amendment because he did not believe it right to
leave questions of that kind to the people of a county but
favored general laws applicable to the whole State (46th day,
pp. 113, 114).   Mr. Mudd, of St. Louis, opposed the amend-
ment because he favored the stock law (p. 115).   Mr. Cottey,
of Knox opposed the amendment because he favored the
township law (p. 117).

Mr. Hale, of Carroll, opposed the amendment because it
would almost destroy the power of the legislature; because
laws that would suit one locality would not suit another,
laws that would suit a large city would not suit an agricultural
district—and the people of each locality should have a right to
say whether the law should apply to them or not; cited the
stock law and the township law (pp. 118 to 121).

Mr. Halliburton, of Sullivan, favored the amendment
because it would stop the passage of special laws under the
guise of general laws (pp. 122, 123).   Mr. Massey, of Newton,
said, under the first section of this article, it is provided:
"The legislative power shall be vested in a Senate and House
of Representatives to be styled the General Assembly;" and
asked Mr. Hale how the stock law or township law could be
reconciled with this section: "Where is the lawmaking power
in such cases?" (pp. 124, 125).   Mr. Hale answered that the

courts had long ago settled the doctrine that the legislature might pass a law which should apply in only those localities which ratified it by a vote of the people (p. 125). Mr. Massey, replied that such a practice, derived from the French system of submitting a *projet* to be voted on by the people was strictly unconstitutional, and added that he thought "the provision for the judiciary department, particularly, will do away with township organization" if this Constitution is adopted (pp. 125, 126).

Mr. Bradfield asked if there was anything in the Constitution that prohibited the General Assembly from passing a stock law in certain counties. Mr. Hale replied that a special stock law was not prohibited (p. 128).

Mr. Shanklin said special stock laws could be passed without requiring the ratification of the people; that section 54 provides a method of passing special laws (pp. 128, 129).

Mr. Hale asked if he thought a local law applicable to St. Louis or Boone county, would be constitutional (p. 129).

Mr. Shanklin answered that where a local law was desirable and a general law could not be made applicable, the local law could be passed by following the provisions of section 54 (pp. 129, 130).

Mr. Gottschalk opposed the amendment, instancing the extending of a city's limits by a vote of the people, under a general law, while the Constitution prohibited the Legislature from passing a special act changing the charter of a city (p. 130). Referred to allowing the city and county of St. Louis to vote to consolidate or separate. (p. 131); favored leaving such laws to be adopted by a vote of the people of each locality (p. 132).

Mr. Lackland said that the amendment conflicted with section 13 (now section 54, article 4) which provides that in some cases local or special bills may be passed upon notice being given (pp. 132-133). The object of which was to obtain

the sense of the locality, and said that he believed the best way to get the sense of a people was by a vote (p. 133).

Mr. Bradfield said the object of the amendment was not to prevent proper special legislation but to prevent special legislation under the guise of a general law (p. 133).

Mr. McAfee asked if a general stock law could not be passed which would affect only the counties voting to accept it (p. 134).

Mr. Bradfield said the General Assembly could not pass any local or special law which is specially prohibited, but outside of such prohibited laws it could do so (p. 134-135) and that special stock laws and township laws were not specially prohibited (p. 135).

Mr. McAfee replied that a special law could not be passed where a general law could be made applicable, which was a judicial question, and said that the Supreme Court would always decide that a general stock law could be made applicable without resorting to a special law (p. 136).

Mr. Bradfield answered that it depended upon the meaning of the word "applicable"—"If it is *suitable* or practicable" (p. 136).

Mr. Brockmeyer said the view taken was that if the object to be accomplished was local, a general law applying to the whole State would not be "applicable," hence a local law could be passed (p. 137), and that if this had not been his understanding he would never have voted for the prohibition against local or special laws, because some localities needed laws which others did not (p. 138), and so a general law would not cover their diversified interests (p. 138).

Mr. Alexander opposed the amendment because it would affect the stock law (p. 141).

Mr. Johnson, of Cole, said: "I understand the object of this section to be not only to reduce the amount of legislation but to establish uniformity of laws throughout the State. Now to my mind unless this amendment is adopted we might

just as well not adopt any portion of this section, it can all
be frittered away from one end to the other. The section
commences, 'The General Assembly shall not pass any local
or special law,' then come various subjects. That implies
that general laws may be passed on every one of these sub-
jects and it is now held that a law is a general law which goes
into effect nowhere except where the people adopt it. Take
for instance the ninth line; no local or special law shall be
passed authorizing, 'the creation, extension or·impairing of
liens.' Suppose the Legislature wants to extend the force
and effect of the lien of judgments or executions in the county
of St. Louis (p. 142), why, they pass a general law and say
that any county that adopts this shall have this law. They
don't repeal the old law and there is the trouble. A great
portion of the State would remain under the old law, while
any particular county can take this new general law, as it is
called, and adopt it. Take another subject—the location
and changing of county seats. The Legislature wants to
make a change of a county seat in any one county, and they
provide by general law that a county seat may be changed in
a certain way, and the people will adopt that law in a particu-
lar county. It may be made solely for the benefit of a par-
ticular county, but they disguise it under the form of a gen-
eral law and the people adopt it. It may be adopted only by
one county and the general law upon the subject of county
seats may remain as it was before. When they adopt this
law providing it may (p. 143) be adopted by a particular
county, they don't make that the only law; the general law
remains, but in a particular county it is changed in that way.
So with the laws of succession and descent; they may change
the laws of descent in a particular county, the general· law of
descent throughout the State may be one thing, and yet they
may provide another law of descent whereby one county or a
dozen counties, by adopting it, may have a different law of
descent. I say you may take this whole section from begin-

ning to end and there is scarcely a thing in it except where the prohibition relates to the inherent nature of the law itself, that these prohibitions can not be frittered away in that manner. It seems to me we are attempting to sacrifice the beneficient purpose of those whole sections to a dog law or a stock law which we may never need" (p. 144).

A vote was then taken and the amendment was rejected. Ayes, 22; noes, 31 (p. 148).

It thus appears that after adopting a prohibition against laws which should apply to only such localities as by a vote of the people of such localities was made applicable thereto, the framers of the Constitution reconsidered their action, and fearing that such a prohibition in the Constitution might affect the validity of the stock law or the township law, the local option law or some other law, which had theretofore been passed in that form, and being in favor of giving the people of each locality the right to vote for or against adopting such a law, the majority of the convention refused to embody such a provision in the Constitution.

The argument against the validity of laws of this character is, briefly, that a law is a rule of conduct prescribed by the lawmaking power of the State; that the lawmaking power is by article 3 of the Constitution vested in the legislative branch of the government, except in the specific cases where the power to adopt a law or make a law applicable is reserved by the Constitution to the people, and hence that laws of this character, commonly called "local option laws," are not laws at all, but are unconstitutional delegations of power by the Legislature to the people and therefore are abdications of power by the lawmakers and so are void. The argument further employed is that the Constitution specifies by sections 2, 3, 4, 7, 9, 16, 20 to 23 of article 9, and by section 12, of article 10, when the people of a locality have a right to vote whether a law shall apply to them or not, and that upon the principle of *"expressio unius est exclusio alterius,"* it was

never intended to reserve such a right to the people of a locality in any other case except those enumerated in the sections of the Constitution quoted.

The matter is thus left in this shape: this court in the township organization law (55 Mo. 295), advised the Legislature that laws of this character would be constitutional; the Legislature has since passed many such laws, presumably upon the faith of that advice; the framers of the Constitution of 1875 expressly refused to put a prohibition against such laws in the Constitution because they believed in the stock laws, the township organization laws, the local option laws, and the like; this court has many times since declared such laws constitutional; there is no express provision in the Constitution allowing such laws as the act under consideration, but the express reservation of power to the people is contained in the sections of the Constitution above quoted; the legislative power of the State is vested in the General Assembly, but it has been thus decided in this State that such laws are not a delegation of legislative power, but that they are perfect laws, capable of applying to every part of the State, and that the vote of the people does not create but only puts in effect the law in each locality.

Speaking for myself alone, I believe that on principle acts which are referred to the people of the whole State for adoption or rejection, are not complete or perfect laws; that they are a delegation and abdication of legislative powers and duties, which was unwarranted under the Constitution of 1865, and is without authority under the Constitution of 1875; that it is a solecism to say a law is a law which requires any act to be performed by the people at large after it leaves the hands of the Legislature, to make it effective all over the State.

I further believe that local laws upon all subjects not expressly prohibited by section 53 of article 4, can be directly and constitutionally passed for the benefit of any locality that

wants such laws, by pursuing the methods provided by section 54, article 4, that is, giving the required notice and having a special act passed suitable to the wants of such locality, and which will not apply to other localities that do not desire such regulations, but that the Legislature is absolutely prohibited from enacting any local or special law relating to any matter enumerated in section 53.

No clearer exposition of the rule as to local option laws has ever been given than that stated by WAGNER, J., in State ex rel. v. Wilcox, 45 Mo. 458, where, after stating the position taken by the opponents of the rule to be that it "is not a law of its own force, enacted by the lawmaking power of the land, but depends for its existence upon a vote of the people of the locality where it is sought to be made operative," he said: "It is undoubtedly true that under our form of government, laws must be enacted by the legislative bodies to which the legislative power is committed by the Constitution. The legislators can not divest themselves of the responsibility of enacting laws by a reference of the question of their passage to their constituents. One of the earliest cases on the subject is Barto v. Himrod, 4 Seld. 483, where the legislature of New York framed a law concerning free schools. The Legislature did not enact or adopt the law; but the tenth section of the act declared that the electors should determine by ballot, at the next annual election, whether the act should or should not become a law. There it will be perceived that the Legislature merely proposed the law, and left its enactment to the people. The court of appeals held that the law having never been passed by the Legislature—the only body under the Constitution that was competent to pass a law—it was void and of no effect......Now, the Legislature can not propose a law, and submit it to the people to pass or reject it by a general vote. That would, indeed, be legislation by the people. But the proposition can not be successfully controverted that a law may be passed to take effect on the happening of a future

event or contingency. The future event—the happening of the contingency, or the fulfillment of a condition—affords no additional efficacy to the law, but simply furnishes the occasion for the exercise of the power. The law is complete and effective when it has passed through the forms prescribed for its enactment, though it may not operate, or its influence may not be felt, until a subject has arisen upon which it can act. In the case we are now considering" (which was chapter 47, G. S. 1865, which authorized the formation of school districts) "the act took effect with the other laws contained in the statute. It was passed according to the prescribed forms designated in the Constitution. Its enactment did not depend upon any popular vote, but parties to be affected by it were at liberty to accept the privileges granted, and incur the burdens and obligations it would impose, as their interest or will should dictate. If they elected not to avail themselves of its privileges, it did not in the least impair its force; it still stood a valid enactment on the statute book. If they organized under it, they were entitled to the benefit of its provisions; but in either event the law remained the same. There is no pretense, therefore, for saying that the law is objectionable because it depends for its efficacy on the vote of the people."

This case was cited and approved in the opinion given by Judges ADAMS, WAGNER, SHERWOOD and EWING on the Township Organization Law, 55 Mo. 295, and substantially the same reasoning was employed, as will appear by the following excerpt from that opinion: "This Township Organization Law contains no provisions, so far as we are able to see, prohibited by the Constitution. It is a general law made for the whole State, and by the terms of the act itself took effect from and after its passage. Every county in the State may avail itself of the privileges offered by this law by a majority vote of its people. It is left to the option of the counties, whether they organize under the law or not. If

a majority vote for it, such vote does not create the law, but places the county so voting within its provisions, and the organization then takes effect, and also the law, as it existed before the vote was taken.   The law does not delegate, nor was it the intention of the lawmakers to delegate, legislative authority to the counties.   Unless the counties avail themselves of the right to organize they will remain as they were, unaffected by any of the provisions of this statute.   It is unnecessary to elaborate this point or to write a lengthy political essay on a subject, which, it seems to us, needs no illustration."

The act there said to be constitutional contained a section which provided:   "This act shall apply to and be in force in all counties adopting the act to provide for Township Organization, and takes effect from and after its passage."   It also provided for an election by the people of a county to determine whether the law should apply to such county, and if a majority of the legal voters of the county voted for such township organization, "then the county shall be governed by and subject to, the provisions of this act, on and after the first Tuesday in April next succeeding."   It will be noted that of all the judges then composing the bench of this court, Judge VORIES alone dissented from this opinion, and that he held that such a law was unconstitutional because it was a delegation of legislative power, and that it would apply to only such counties as voted to adopt the act, thereby making the law different in different counties, or if no county voted to adopt it, then it would be a dead letter, and hence he concluded that such an act was not a law at all, for its validity, its force and its taking effect were dependent upon some power other than the lawmaking power of the State.

All the local option decisions in our State are based upon the reasoning employed in the Wilcox case, and in the opinion on the Township Organization Law.

Substantially the same reasons have been given in other

jurisdictions for upholding local option laws. The great length of this opinion prevents a review or even a specific reference to such cases in other States. In addition to the cases referred to in State ex rel. Maggard v. Pond, 93 Mo. 606, a very full list of the cases bearing on such laws will be found collected in 6 Am. & Eng. Ency. of Law (2 Ed.), p. 1021, *et seq.*, and notes. The great weight of authority—the almost universal rule—is that legislative power can not be delegated. It is so held by the Supreme Court of the United States, and by the Supreme Courts of California, Delaware, Georgia, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Vermont, Washington and Wisconsin.

It is also held that a law can not be made dependent upon its acceptance or adoption by the people, in California, Iowa, Massachusetts, Nevada, New Hampshire, New York, Ohio and Pennsylvania (6 Am. & Eng. Ency. of Law, p. 1022, note 7). In Pennsylvania (Locke's Appeal, 72 Pa. St. 508), it was held that if the Legislature had the power to make the law dependent upon a vote of a majority of the voters, it could also confer that power upon a minority, and in California (Ex parte Wall., 48 Cal. 313), it was held that the legislature has no more right to refer such a question to the whole people than it has to refer it to a single individual, and in Ohio (Railroad v. Clinton Co., 1 Ohio St. 77), it was held that the people had, by the Constitution, vested the power to make laws in the General Assembly, and that, "to allow the General Assembly to cast it back upon them, would be to subvert the Constitution and change its distribution of powers, without their action or consent." On the other hand, it was held in Vermont (State v. Parker, 26 Vt. 357), and in Wisconsin (Dowling v. Ins. Co., 92 Wis. 63), that the question of when an act

shall take effect may be made to depend upon a vote of the
people at large, but in Michigan (People v. Collins, 3 Mich.
343), the Supreme Court was equally divided on this question.

And a law which is complete in all its provisions when it
leaves the legislative branch of government, but leaves it to the
option of the people of each locality in the State to become
subject to it or to adopt it, has been held to be constitutional
in New Hampshire (State v. Noyes, 30 N. H. 279), in Texas
(Johnson v. Martin, 75 Texas 33), in Wisconsin (State ex rel.
v. O'Neill. 24 Wis. 149), and in West Virginia (Rutter v.
Sullivan, 25 W. Va. 427). But in Massachusetts (Opinion
of Justices, 160 Mass. 586), it was held that such laws could
not be made subject to acceptance or adoption by a vote of
the people, if they related to matters of general concern to the
State at large, and were only permissible when they related
to matters of mere local importance.

Thus reason, principle and the distribution of powers
under the Constitution condemn such laws, as applied to the
State at large, and while there is a great conflict in the prece-
dents in other States upon the validity of such laws, as ap-
plied only to matters of local concern, the almost universally
recognized rule is that although as a general proposition of
law legislative powers can not be delegated at all, still if the
law is complete when it leaves the hands of the legislature and
the option is given to a political subdivision of the State or to
a locality to adopt it or not by a vote of the people, such option
does not make the law unconstitutional; in this respect agree-
ing with the decisions heretofore rendered by this court,
which were based upon the idea that a law could be passed
which should not take effect except upon the happening of a
subsequent contingency or condition, and that the vote of the
people was such a condition.

Speaking of laws which are made to depend for their ap-
plication upon a vote of the people, Sedgwick in his work on
the Construction of Statutory and Constitutional Law, p. 134,

et seq. after asking the question: "What is the legislative power? What is a law?" and answering it by saying that a law must be a rule of universal application and must be passed by the lawmaking power, says: "Efforts have been made, in several cases, by the state legislatures to relieve themselves of the responsibility of their functions, by submitting statutes to the will of the people, in their primary capacity. But these proceedings have been held, and very rightly, to be entirely unconstitutional and invalid. The duties of legislation are not to be exercised by the people at large. The majority governs, but only in the prescribed form; the introduction of practices of this kind would remove all checks on hasty and improvident legislation, and greatly diminish the benefits of representative government." Then he quotes from Barto v. Himrod, 4 Seld. 483, which was followed and approved in State ex rel. v. Wilcox, 45 Mo. 458, where it is said: "The government of this State is democratic; but it is a representative democracy, and in passing general laws, the people act only through their representatives in the legislatures."

The author then points out (p. 135 note a) that statutes creating municipal corporations or imposing liabilities upon them or authorizing them to create debts or to make improvements, and depending for their application upon a vote of the locality, have been sustained in New York, California, Mississippi, Maine, Missouri, Pennsylvania, Texas, Tennessee, Wisconsin and Florida. He also shows that school laws or any local laws come under the same principle, citing Bull v. Read, 13 Gratt. 78, and Hobart v. Supervisors, 17 Cal. 23. He concludes his discussion in this way: "In general, statutes fully enacted by the legislature may be conditioned in their operation, to take effect upon some future event. [State v. Parker, 26 Vt. 357; Bull v. Read, 13 Gratt. 78; State v. Kirby, 29 Md. 85; Peck v. Weddell, 17 Ohio, N. S. 271.] And it has been held that if a general law is passed to take effect at one or the other of two specified times, the question may be referred to

a popular vote of the whole State at which of these times it shall go into effect. State v. Parker, 26 Vt. 357; and see People v. Collins, 3 Mich. 343, in which the court was equally divided. Subject to the foregoing exceptions and limitations, the question whether a general law shall go into effect or not can not be referred to a popular vote of the whole people. [People v. Stout, 23 Barb. 349; State ex rel. v. Wilcox, 45 Mo. 458; State v. Field. 17 Mo. 529; State v. Swisher, 17 Tex. 441; State v. Beneke, 9 Iowa 203; Bank of Chenango v. Brown, 26 N. Y. 467.]"

The same author in further illustration of the rule, points out that in New York (Thorne v. Cramer, 15 Barb. 112, and Barto v. Himrod, 4 Seld. 483), an act to establish free schools in that State which by its terms was to become a law only in case the people of the whole State voted to adopt it, was held to be entirely void; and in Pennsylvania (Parker v. Commonwealth, 6 Barr 507), an excise statute which was made to depend for its adoption upon a vote of the people of the whole State was likewise held void; and that in Indiana a provision was put into the Constitution that: "No law shall be passed, the taking effect of which shall be made to depend upon any authority except as provided in the Constitution."

Judge COOLEY, in his invaluable work on Constitutional Limitations (6 Ed.), p. 137 et seq., discusses the subject in such a masterful manner as to preclude further argument on the subject. He says: "One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws can not be delegated by that department to any body or authority. Where the sovereign power of the state has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the Constitution itself is changed. The power to whose judgment, wisdom and patriotism this high prerogative has been entrusted can not relieve itself of the responsibility by choosing other agencies upon which the power shall. be devolved, nor

can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust.

"But it is not always essential that a legislative act should be a completed statute which must in any event take effect as law, at the time it leaves the hands of the legislative department. A statute may be *conditional*, and its taking effect may be made to depend upon some subsequent event. Affirmative legislation may in some cases be adopted, of which the parties interested are at liberty to avail themselves or not at their option. A private act of incorporation can not be forced upon the corporators; they may refuse the franchise if they so choose. In these cases the legislative act is regarded as complete when it has passed through the constitutional formalities necessary to perfected legislation, notwithstanding its actually going into operation as law may depend upon its subsequent acceptance. We have elsewhere spoken of municipal corporations, and of the powers of legislation which may be and commonly are bestowed upon them, and the bestowal of which is not to be considered as trenching upon the maxim that legislative power must not be delegated, since that maxim is to be understood in the light of the immemorial practice of this country and of England, which has always recognized the propriety and policy of vesting in the municipal organizations certain powers of local regulation, in respect to which the parties immediately interested may fairly be supposed more competent to judge of their needs than any central authority. As municipal corporations are mere auxiliaries of the state government in the important business of municipal rule" [the same doctrine was recently reannounced by this court in banc, speaking through GANTT, C. J., in State ex rel. Hawes v. Mason, 153 Mo. 23, and Webb City and Carterville Waterworks Company v. City of Carterville, 153 Mo. 128], "the legislature may create them at will from its own views of propriety or necessity, and without consulting

the parties interested; and it also possesses the like power to abolish them, without stopping to inquire what may be the desire of the corporators on that subject.

"Nevertheless, as the corporators have a special and peculiar interest in the terms and conditions of the charter, in the powers conferred and liabilities imposed, as well as in the general question whether they shall originally be or afterwards remain incorporated at all or not, and as the burdens of municipal government must rest upon their shoulders, and especially as by becoming incorporated they are held, in law, to undertake to discharge the duties the charter imposes, it seems eminently proper that their voice should be heard on the question of their incorporation, and that their decisions should be conclusive, unless, for strong reasons of state policy or local necessity, it should seem important for the State to overrule the opinion of the local majority. The right to refer any legislation of this character to the people peculiarly interested does not seem to be questioned, and the reference is by no means unusual.

"For the like reasons the question whether a county or township shall be divided and a new one formed, or two townships or school districts formerly one be reunited, or a city charter be revised, or a county seat located at a particular place, or after its location removed elsewhere or the municipality contract particular debts, or engage in a particular improvement, is always a question which may with propriety be referred to the voters of the municipality for decision.

"The question then arises, whether that which may be done in reference to any municipal organization within the State may not also be done in reference to the State at large. May not any law framed for the State at large be made conditional on an acceptance by the people at large, declared through the ballot box? If it is not unconstitutional to delegate to a single locality the power to decide whether it will be

VOL. 154 mo—33

governed by a particular charter, must it not quite as clearly be within the power of the legislature to refer to the people at large, from whom all power is derived, the decision upon any proposed statute affecting the whole State? And can that be called a delegation of power which consists only in the agent or trustee referring back to the principal the first decision in a case where the principal is the party concerned, and where perhaps there are questions of policy and propriety involved which no authority can decide so satisfactorily and so conclusively as the principal to whom they are referred?

"If the decision of these questions is to depend upon the weight of judicial authority up to the present time, it must be held that there is no power to refer the adoption or rejection of a general law to the people of the State, any more than there is to refer it to any other authority. The prevailing doctrine in the courts appears to be, that, except in those cases where, by the Constitution, the people have expressly reserved to themselves a power of decision, the function of legislation can not be exercised by them, even to the extent of accepting or rejecting a law which has been framed for their consideration. 'The exercise of this power by the people in other cases is not expressly and in terms prohibited by the Constitution, but it is forbidden by necessary and unavoidable implication. The Senate and Assembly are the only bodies of men clothed with the power of general legislation. They possess the entire power, with the exception above stated. The people reserved no part of it to themselves (with that exception), and can therefore exercise it in no other case.' It is therefore held that the legislature have no power to submit a proposed law to the people, nor have the people power to bind each other by acting upon it. They voluntarily surrendered that power when they adopted the Constitution. The government of the State is democratic, but it is a representative democracy, and in passing general

laws the people act only through their representatives in the legislature."

In this connection it is meet to pause to note the fact that both Sedgwick and Cooley refer to Barto v. Himrod, 4 Seld. 483, in support of the proposition that it´is not lawful or constitutional to refer an act that affects the whole people to the vote of the people at large, while they hold that acts that are of mere local concern may properly be referred to the people of the locality for their adoption or rejection, and that Barto v. Himrod, related to an act to establish free schools in the whole State, provided the people of the whole State voted to adopt the act.    Barto v. Himrod was referred to by WAG-NER, J., in State ex rel. v. Wilcox, 45 Mo. 458, but the Judge did not point out that in the Barto case the question of adoption was referred to the people at large, whereas in the Wilcox case, chapter 47 of the Revised Statutes of 1865 was under consideration, and that chapter did not depend for its adoption· upon the vote of the people at large, but was a permissive statute, which enabled any city, town or village, to organize as a school district, upon the people of such city, town or village, voting to adopt or reject the privileges conferred by that chapter.    It will thus be seen that the Barto case had no application whatever to the Wilcox case.    The distinction, however, was not noted in that case, and every case since has followed the Wilcox case, but in none of them has the distinction so clearly pointed out by Sedgwick and Cooley between referring a law affecting all the people to a vote of the people at large, and a law which simply grants a power or permission to a locality to be exercised or not as the people of the locality may decide by vote, been noticed or explained.    To this may be attributed much of the confusion in the adjudicated cases and of the diversity of opinion among the judges.

Endlich on the Interpretation of Statutes, sec. 499, p. 702, lays down the rule that statutes may be passed which

shall take effect only at a future day, or upon the happening of a future contingency, and that a vote of the people of the locality to be affected by the statute is such a contingency.

Sutherland on Statutory Construction, sec. 75, says: "It is now settled that laws, at least of local application, may be imperative or permissive; they may authorize the people of cities, villages, townships, counties, groups of counties, or other limited districts, not otherwise defined than for the purposes of such acts, to determine for themselves local questions of police, taxation, or any other matter affecting their local welfare; and the law may be conditioned to carry into effect their determination or option. [Blanding v. Burr, 13 Cal. 343; People v. Salomon, 51 Ill. 37.] They have thus been authorized to decide by popular vote and execute their decision to contribute for the building of railroads or other like public improvements [Starin v. Town of Genoa, 23 N. Y. 439; Clarke v. Rochester, 28 N. Y. 605; Grant v. Courter, 24 Barb. 242; Corning v. Greene, 23 Id. 33; Cincinnati, etc., R. R. Co. v. Commissioners, 1 Ohio St. 77; Hobart v. Supervisors, 17 Cal. 23; Moers v. Reading, 21 Pa. St. 189; Bank of Rome v. Village of Rome, 18 N. Y. 38; Cotton v. Leon County, 6 Fla. 610; Powers v. Inferior Ct., 23 Ga. 65; State v. O'Neill, Mayer, etc., 24 Wis. 149; Alcorn v. Hamer, 38 Miss. 652; Slack v. Maysville, etc., R. R. Co., 13 B. Mon. 1]; to divide a county or organize a new one [People v. Reynolds, 5 Gilm. 1; People v. Burns, 5 Mich. 114]; to establish or remove a county seat [Barnes v. Supervisors, 51 Miss. 305; Ex parte Hill, 40 Ala. 121; Commonwealth v. Painter, 10 Pa. St. 214]; whether there shall be license or prohibition of the liquor traffic [Caldwell v. Barrett, 73 Ga. 604; Hammond v. Haines, 25 Md. 541; Commonwealth v. Weller, 14 Bush. 218; State v. Cooke, 24 Minn. 247; Fell v. State, 42 Md. 71; Locke's Appeal, 72 Pa. St. 491; s. c., 13 Am. R. 716; Boone v. State, 12 Tex. App. 184; Groesch v. State, 42 Ind. 547; Schullherr v. Bordeaux, 64 Miss. 59; Commonwealth v. Ben-

nett, 108 Mass. 27; State v. Wilcox, 42 Conn. 364; State v. Court Com. Pleas. 36 N. J. L. 72; s. c., 13 Am. R. 422; Barnes v. Supervisors, 51 Miss. 307; Alcorn v. Hamer, 38 Id. 745]; whether paupers shall be a county or township charge [Town of Fox v. Town of Kendall, 97 Ill. 72]; whether they shall have a system of free schools [Bull v. Read, 13 Gratt. 78]; whether domestic animals shall be permitted to run at large [Holcomb v. Davis, 56 Ill. 413; Erlinger v. Boneau, 51 Id. 94; Dalby v. Wolf, 14 Iowa, 228]. The people locally interested may have the option to accept or reject a municipal charter or amendatory acts [Mayor, etc., v. Finney, 54 Ga. 317; Wales v. Belcher, 3 Pick. 508; City of Paterson v. Society, 24 N. J. L. 385; People v. Butte, 4 Mont. T. 179; s. c., 47 Am. R. 346], or local police law [Boyd v. Bryant, 35 Ark. 69; s. c., 37 Am. R. 6].

"Acts giving such local options have not unfrequently been framed to secure it by making a new law go into effect or not according to the result of a popular vote.

"In State v. Noyes, 30 N. H. 279, the people in a town meeting adopted a general law to suppress bowling alleys, and thereby, pursuant to its provisions, put it locally in operation.

"In Mississippi an act for local taxation was, by its terms, suspended, and ceased to have effect by a protest of a majority of the legal voters. [Williams v. Commack, 27 Miss. 209.]

"By the terms of a local act of Wisconsin it was to be void unless the legal voters of the city to which it was applicable should vote to accept it. It was an act to establish a board of public works. It was held valid; that it was a Constitutional act to take effect or go into operation only upon a contingency provided in the law itself. [State v. O'Neill, Mayor, etc., 24 Wis. 149.]

"In a Virginia act for local free schools it was provided that the act should not be carried into effect until a majority of the people of the district should approve it. It was sustained as constitutional. [Bull v. Read, 13 Gratt. 78.]

"In Boyd v. Bryant, 35 Ark. 69; s. c., 37 Am. R. 6, a general police law, to take effect upon local adoption, was held constitutional.

"Such cases as Rice v. Foster, 4 Harr. 479; Parker v. Commonwealth, 6 Pa. St. 507, now overruled in Locke's Appeal, 72 Id. 491; Ex parte Wall, 48 Cal. 279, and Maize v. State, 4 Ind. 342, substantially overruled by Groesch v. State, 42 Ind. 547, are now exceptional, and are simply out of harmony with the law as generally held throughout the country.

"On the whole it may perhaps be considered a sound conclusion, and I think it is supported by a preponderance of authority, that whether an act is general or local the legislature may in their wisdom take into consideration the wishes of the public, and determine not to impose a law on an unwilling or non-consenting people. Having the power to make their laws conditional to take effect only on the happening of contingent events, what the event shall be on which the taking effect of an act shall depend is not a judicial question, but wholly and absolutely within the discretion of the legislature like the emergency which will induce them to make an act take immediate effect, and that the result of a popular vote is a contingent event within that discretion."

Perhaps no clearer opinion has ever been written as to the essential differences between a general law, which applies to the whole State and which was by its terms made to take effect only upon a vote in favor of it by the people at large, and a permissive or enabling law which related to a mere local matter, and which was to apply only to such municipalities or localities as by a vote of the people thereof elected to accept and exercise the powers and privileges conferred by the act, than the Opinion of the judges of the Supreme Court of Massachusetts, given to the House of Representatives, on the 2d of February, 1894, and reported in 160 Mass. 586. Three questions were propounded by the House of Representatives

to the Supreme Court, to wit:      1st, whether a law granting female suffrage as to town and city elections would be constitutional, if it depended upon the acceptance of a vote of the people at large; 2d, whether such a law would be constitutional if it depended upon its acceptance by a majority vote of such city or town; and, 3d, whether such a law would be constitutional, to take effect upon the acceptance by the people at large, including women specially authorized by the act to register and vote on that question alone. We are concerned here only with the answers as to the first and second questions, both of which were answered in the negative, because female suffrage was not a matter of local concern. After referring to the form of government and the distribution of powers under the constitution of that State, which is, in this respect, very similar to ours, the opinion says:

"The constitutions of the different states resemble one another in many of their principal provisions, and it generally has been held, whenever the subject has come before the courts, that the legislative power can not be delegated by the legislature to any other body or authority, and that the people themselves have not retained this power except where they have expressly provided for it.

"It is true that a general law can be passed by the legislature, to take effect upon the happening of a subsequent event. Whether this subsequent event can be the adoption of the law by a vote of the people has occasioned some differences of opinion, but the weight of authority is that a general law can not be made to take effect in this manner. Whether such legislation is submitted to the people as a proposal for a law, to be voted upon by them and to become a law if they approve it, or as a law to take effect if they vote to approve it, the substance of the transaction is that the legislative department declines to take the responsibility of passing the law; but the law has force, if at all, in consequence of the votes

of the people; they ultimately are the legislators. It seems to us that by the Constitution the Senate and the House of Representatives have been made the legislative department of the government, and that there has not been reserved to the people any direct part in legislation. The various amendments made to the Constitution since its adoption have not changed its character in this respect. By the second and ninth articles of amendments to the Constitution, an Act constituting a town or towns a city government can be passed only with the consent of the inhabitants of such town or towns, and specific amendments to the Constitution proposed by the General Court must be submitted to the qualified voters of the commonwealth. A city charter resembles a state constitution in this, that the government of the town is made by the charter a representative government, and it was originally declared that the people alone have a right to institute government and to change it. Declaration of Rights, art. 7. These amendments, as well as the other amendments to the Constitution, indicate no intention of having laws submitted to the people for adoption or rejection.

"For these reasons, we are of opinion that the first question should be answered in the negative.

"The second question requires additional consideration. There have been laws from the earliest times which delegated legislative powers to the inhabitants of towns, or permitted legislative powers to be exercised by such inhabitants, over subjects which were declared proper for municipal conduct. Laws conferring additional powers on towns or cities have been passed and made to take effect in any town or city upon acceptance by the qualified voters of the town or city, or of the city council. Some examples are found in Pub. Sts., c. 27, secs. 13, 27, 65, 74. Special laws have been passed conferring special powers on particular towns or cities, and general laws have been passed which relate to towns and cities having a certain population; and the consent of the inhabi-

tants of a city or town sometimes has been required before certain special powers can be used. See Pub. Sts., c. 44, secs. 2, 7; c. 54, sec. 13; St. 1887, c. 411, sec. 92; St. 1891, c. 370. These statutes in general relate to local affairs, or to what has been called police regulations.

"In Stone v. Charlestown, 114 Mass. 214, it was decided that a statute was constitutional which united two municipalities and provided that the act should not take effect unless accepted by the voters of the respective municipalities. It was said: 'Amid all the diversity of opinion upon the much vexed question, how far statutes may be made contingent upon being accepted by popular vote without violating the principle that legislative power can not be delegated, there is a complete harmony of adjudication in favor of the authority of the legislature, unless controlled by a special constitutional provision upon the subject, to submit statutes dividing or uniting counties or towns, or establishing or enlarging a city, to a vote of the inhabitants of the territory immediately affected.'

"There has been some conflict of authority upon the constitutionality of what are called local option laws, which have been principally laws regulating the sale of intoxicating liquors, but they have been held to be constitutional by a majority of the courts which have considered them. They have been held to be constitutional in this commonwealth. [Commonwealth v. Bennett, 108 Mass. 27.] In that case it is said: 'It has been argued in other cases, which have been brought before the court since the argument of the present case, that these statutes are unconstitutional, because they delegate to cities and towns a part of the legislative power. But we can see no ground for such a position. Many successive statutes of the commonwealth have made the lawfulness of sales of intoxicating liquors to depend upon licenses from the select men of towns or commissioners of counties, and such statutes have been held to be constitutional. [7

Dane Abr. 43, 44; Commonwealth v. Blackington, 24 Pick. 352.] It is equally within the power of the legislature to authorize a town by vote of the inhabitants, or a city by vote of the city council, to determine whether the sale of particular kinds of liquors within its limits shall be permitted or prohibited. This subject, although not embraced within the ordinary power to make by-laws and ordinances, falls within the class of police regulations which may be intrusted by the legislature by express enactment to municipal authority.'

"It is certainly a difficult question to determine how far the principle of local option can be carried, and to what subjects it can be applied. An act granting to women the right to vote in town and city elections does not relate to the powers of towns and cities, which in some respects may well be different in different towns and cities on account of the number, wealth, and pursuits of the inhabitants. Such an act relates solely to the persons who should be invested with a share of political power. Whether women should be permitted to vote in town and city elections seems to us a matter of general, and not of local concern. There is nothing in the history of Massachusetts which tends to show that the right to vote in towns and cities on town and city affairs has ever been regarded as a matter of police regulation or of merely local interest, or as a right which might be granted or withheld by a licensing board. It always has been determined by the legislature by a general law, in force uniformly throughout the commonwealth."

From what has been shown, the rule may be stated to be that a law which affects the people of the whole State can not be made to depend for its validity, its acceptance, adoption or applicability upon a vote of the people at large, for such a law would be an unauthorized delegation of legislative power, but a permissive or enabling law as to matters of mere local concern which confers a power or privilege upon such munici-

palities or localities as vote to adopt or accept the same, is constitutional.

No law has yet been presented to this court of the character first spoken of. The General Assembly has never passed a law, so far as I am advised, affecting the whole people and made it dependent in any manner upon a vote of the people at large. Every law that has been construed by this court was a law, mandatory, prohibitory, or permissive, which conferred a power or privilege upon a locality, city, town, township or county, and left it to the political subdivision of the State in its corporate capacity or to the people of such subdivision, to decide whether the power or privilege should or should not be exercised. An examination of the previous decisions of this court shows this to be true. State v. Searcy, 20 Mo. 489, and State ex rel. v. Hudson, 78 Mo. 304, related to the dramshop law. St. Louis v. Alexander, 23 Mo. 483, related to a stock subscription by a city. State v. Binder, 38 Mo. 450, related to the Sunday law. The Opinion of the Judges in 55 Mo. 295, related to township organization. Lammert v. Lidwell, 62 Mo. 188, related to the stock law. State ex rel. v. Wilcox, 45 Mo. 458, related to the school law. State ex rel. Maggard v. Pond, 93 Mo. 606, related to the local option law; that is, to "An act to provide for the preventing of the evils of intemperance by local option *in any county in this State, and in cities of twenty-five hundred inhabitants or more, by submitting the question of prohibiting the sale of intoxicating liquors to the qualified voters of such county or city;* to provide penalties for its violation, and for other purposes." And the cases decided since, all relate to local option laws.

Everyone will at once admit that the laws of a State which affect the whole people must be the same in every part of the State. Ever since the days of Blackstone (1 Blackstone's Com., 85) it has been the accepted construction that a public act must affect the whole community alike.

[City of Kansas v. Clark, 68 Mo. 588, cited and approved in Ex parte Hollwedell, 74 Mo. l. c. 401.]   It was to more completely effectuate this principle that section 53 of article 4 of the Constitution was adopted, which prohibits the passage of any special law where a general law could be made applicable.

For instance, it could not be successfully contended that the criminal laws or the statute of descents, or the statute of limitations, or the laws relating to marriage or divorce, or the land laws, or any other general law in which every citizen is interested, could be legally varied in different localities of the State, by any law or method of procedure whatever.   But while this is true it is equally true that general laws which confer a power or privilege upon a city, town, village, township, county, school district, drainage district, or other political subdivision of the State, to be exercised or not as the constituted governmental authorities of such localities, or as the people by their votes, or a petition to the same effect, may or may not elect to exercise or take advantage of such powers and privileges, is a constitutional act, and is in no proper sense a delegation of legislative powers.   For instance; the constitution, by section 7, article 9, commands the General Assembly to divide the cities of the State into four classes, and to prescribe the charters by general law.   In doing so certain powers and privileges, which primarily belong to the State, are granted to the municipality, to be exercised by the officers thereof, whenever they see proper, or not at all if they see proper, or such charters may put a limitation upon the powers and privileges granted by requiring that before the constituted authorities shall exercise any given power or privilege, the consent of the people, for whose benefit they were conferred, and who must bear the whole burden incident to the right, must be asked and obtained.   The legislature has passed such general laws granting such powers and privileges, but all of the cities have or have not, may or may not ex-

Owen v. Baer.

ercise all the powers and privileges conferred, with the result that in one city the citizen or one class of citizens may be taxed high, while in another city of the same class the tax may be low, or the power may not be exercised at all, yet no one ever supposed that for such reasons such laws' were a delegation of legislative power, or that, because one city of a class exercised all the powers conferred and another city of the same class did not, or that one city or its people elected to accept and exercise a power or privilege while another city of the same class, or its people, failed or refused to accept or exercise such power or privilege, the law was therefore unconstitutional because all cities of the same class did not exercise all the powers conferred upon cities of their class, and therefore the government of the people was not the same in every such city.

It is not uncommon for city charters to confer a power upon a city which the city officers are prohibited from exercising without the consent of the people, and it has never been held unlawful to so limit a power. In fact all municipal governments are agencies of the State, and exercise some powers of the State. But the powers exercised relate only to matters in which the balance of the people are not specially or financially interested; that is, they are local matters, local regulations, with their accompanying and correlative burdens. Being an exercise of a part of the power of the State, it is as much a delegation of legislative power whether the right to exercise the power granted is left to the pleasure of the officers as it is left to the votes of the people. When carefully scrutinized the difference between the majority and minority opinions in the Maggard-Pond case, so far as they relate to this point, are more seeming than real. The majority opinion reaches the conclusion herein stated, but does not distinguish clearly between laws affecting the whole people and dependent for their existence upon a vote of the people at large, and laws which confer a power upon a locality as to

matters of mere local concern, and which are complete laws when they leave the hands of the Legislature, but which leave the enforcement or exercise of such powers to the will of the constituted authorities of the localities or to the people thereof, while on the other hand, SHERWOOD, J., in the minority opinion clearly points out this distinction. For he said (p. 658): "From these quotations from the adjudications of this court, it will be readily seen that they are in entire harmony with each other. The rule to be deduced from them is plainly this: That in certain classes of cases, as already mentioned, relating to mere local or municipal objects, it is perfectly competent for the legislature, by a law complete in itself—one denouncing penalties for its violation—to submit to the people of certain localities to determine by their votes whether some small, minor regulation, incident to, but not necessary to, the *existence of the law itself*, shall be adopted. But if the law is not complete; if it has no self-enforcing penalty when it leaves the hands of the legislature; if it is a mere proposal to the people of certain localities to determine whether *certain printed matter* which appears on the statute books shall become a law or no, then such a proposal is a clear delegation of legislative power, and for that reason unconstitutional."

It is profitable to note that this is exactly what was said in the constitutional convention of 1875, by Mr. Massey, of Newton county when he said: "Such a practice, derived from the French system of submitting a *projet* to be voted on by the people, is strictly unconstitutional." (Proceedings Constitutional Convention, 46th day, p. 126).

Again in his dissenting opinion in the Maggard-Pond case (678) SHERWOOD, J., said: "I do not deny but that a local option law could be passed, one that would repeal existing laws and denounce heavier penalties than they do against the sale of intoxicating liquors, and leave the *mere incident* of allowing the people by their votes to permit or to deny the issuance

of authority for the sale of such liquors; but, most certainly, such a law must be perfect and complete before it leaves the legislative halls. It must stand on its own independent foundation, bear with it its own self-enforcing penalties, and rest not for its validity on the adventitious aids of the votes of majorities."

Now observe what the majority opinion (p. 622) said: "While this local option act provides that any county, or town, or city of the class named, may, by a majority vote, put such county, town, or city under the operation of the law, it does not refer to them the question of passing a law; that the legislature had already done, and only called upon them to decide by a vote whether they would accept the provisions of a law regularly enacted by both houses of the General Assembly and approved by the Governor. By its provision the law and not the vote extended its influence over the locality voting against the sale of intoxicants. It was the law that authorized the vote to be taken, and when taken the law, and not the vote, declared the result that should follow the vote. The vote was the means provided to ascertain the will of the people, not as to the passage of the law, but whether intoxicating liquors should be sold in their midst. If the majority voted against the sale, the law, and not the vote, declared it should not be sold. The vote sprang from the law, and not the law from the vote. By their vote the electors declared no consequences, prescribed no penalties, and exercised no legislative function. The law declared the consequences, and whatever they may be they are exclusively the result of the legislative will."

Again, at page 654, the majority opinion quoted and approved what was said by |WAGNER, J., in the Wilcox case (45 Mo. 458) in reference to the school laws, as follows: "Now, the Legislature can not propose a law, and submit it to the people to pass or reject it by a general vote. That would, indeed, be legislation by the people. But the propo-

sition can not be successfully controverted that a law may be passed to take effect on the happening of a future event or contingency. The future event—the happening of the contingency or the fulfillment of a condition—affords no additional efficacy to the law, but simply furnishes the occasion for the exercise of the power. The law is complete and effective when it has passed through the forms prescribed for its enactment, though it may not operate, or its influence may not be felt, until a subject has arisen upon which it can act. In the case we are now considering, the act took effect with the other laws contained in the statutes. It was passed according to the prescribed forms designated in the Constitution. Its enactment did not depend upon any popular vote, but parties to be affected by it were at liberty to accept" [*exercise* would have been a better term] "the privileges granted, and incur the burdens and obligations it would impose, as their interest or will should dictate. If they elected not to avail themselves of its privileges, it did not in the least impair its force; it still stood a valid enactment on the statute book. If they organized under it, they were entitled to the benefit of its provisions; but in either event the law remained the same. There is no pretense, therefore, for saying that the law is objectionable because it depends for its efficacy on the vote of the people."

Thus it will be observed that both the majority and minority opinions proceed from the same premises, to wit, that it is a delegation of legislative power for the Legislature to submit to the people at large for their adoption or rejection a law which affects the whole people, but that it is not a delegation of legislative power for the Legislature to enact a complete law, conferring a power or privilege upon a locality as to a mere matter of local concern, and leave it to the will of the constituted authorities of the locality, or to the people thereof, to exercise the power or privilege as they see fit.

The difference, therefore, is not one of principle, but of

the application of the conceded principle to the nature and provisions of the particular act under consideration. This is made plain when the cases heretofore decided are analyzed. Thus the dramshop law (chapter 56, R. S. 1889) is a complete law, but the consent of the people to the issuance of a license under it is required, and yet it has been held not to be a delegation of legislative power. [State v. Searcy, 20 Mo. 489, and State ex rel. v. Hudson, 78 Mo. 304.] The school law (chapter 143, R. S. 1889) is a complete law, but leaves it to the people of a locality to exercise the power conferred, and it has been held constitutional (State ex rel. v. Wilcox, 45 Mo. 458); and has been enforced without question in the cases of State ex rel. Frisby v. Stone, 152 Mo. 202, and State ex rel. Frisby v. Hill, 152 Mo. 234. The consent of the people as a prerequisite to the exercise of a power lawfully granted to a city, was expressly held constitutional by Sherwood, J., in St. Louis v. Howard, 119 Mo. 41-47. The drainage laws of the State (chapter 101, R. S. 1889), which requires the consent of the people before the power granted could be exercised by the locality, were held to be constitutional, in Morrison v. Morey, 146 Mo. 543, and similar laws, as therein pointed out, were held constitutional in California, Illinois, Wisconsin and Mississippi. And this was exactly what the framers of the Constitution intended to allow when they put into the Constitution a prohibition against the specified special laws and required all laws to be general so far as they could be made applicable but refused to prohibit the passage of such laws as the act under consideration and those construed in the cases cited. It is plain that the lawyers in that convention understood the distinction between a proposed law that affected the whole people, that was to depend for its very existence upon a favorable vote of the people at large, and a complete, general law as to local matters, which granted a power and only left it to the

Vol. 154 mo—34

will of the constituted authorities of the localities to be affected by it, or the will of the people thereof, whether such power so granted should or should not be exercised.

Apply these principles to the act now under consideration, and the result is this: By the terms of that act every city having a special charter, and which now or hereafter contains more than two thousand and less than thirty thousand inhabitants, and every city of the third and fourth class is given power to provide for drains and sewers, but before the constituted authorities in any such city undertake to exercise the power thus conferred they are required to obtain the consent of two-thirds of the qualified voters. This is not precisely the language of the act, but it is the true meaning and import thereof. Drains or sewers in a city are matters of mere local concern. It can make no difference to Kansas City whether Cape Girardeau has sewers or not, and it can make no difference to Kahoka whether Ozark has sewers or not. But it does make a difference to each locality, and each locality or the people thereof must "pay the piper," whether they have a right and the power to exercise the privileges conferred by the act or not. The act is general and not local or special because it deals with all persons or things as a class. Every city holding a special charter and having the specified population and every city of the third and fourth classes is given the privilege and granted the power, which must be exercised or not as the people who are to enjoy the privilege and to bear the burdens, may determine, but the power is conferred and will continue to exist, the right is created and will always be available. The law therefore is a complete law. It needs no adventitious aid such as the vote of the people to breathe life into it. It gives a power and relates to a matter of local concern, just as the general municipal laws confer powers of mere municipal concern. It is permissive and enabling but not mandatory, just as the power to license, tax or regulate occupations or to construct any

public improvement, or to issue a dramshop license, or to organize a school district or a drainage district is permissive and not mandatory. The power may be exercised by one of the cities covered by the act and not by any other, but the power is the same whether it is exercised or not, and the fact that if it is exercised by one city such city will have drains and its people will be taxed to pay for them, while another city of the same class will have no sewers and hence the people will not be so taxed, does not make this law invalid or make it offend against the provisions of section 7, article 9 of the Constitution, any more than the general laws prescribing charters for the four classes of cities offend against that section of the Constitution. The power, the right, the privilege, is granted equally and in the same terms to all, and each is given the option to exercise the power conferred and to enjoy the blessings of the law or not as each sees fit.

If the provision providing for a vote of the people had been left out of this act, and the power to provide drains or sewers had been given to all the cities named in the act, no one would deny its legality. In such a case the constituted authorities of such cities could have exercised the power conferred by the act whenever they saw fit, or not at all if they saw fit. As hereinbefore shown it is no more unconstitutional to confer upon the people of a locality the right to exercise a power granted than it is to authorize the constituted authorities of the locality to exercise such a right. Aye, more, as pointed out, it is lawful to require the consent of the people of a locality as a condition precedent to the right of the constituted authorities to exercise a power granted.

This act is not therefore a delegation of legislative power nor obnoxious to the commands of section 7 of article 9 of the Constitution, nor is it a special or local law, and hence it is constitutional.

But it is said that State ex rel. Maggard v. Pond, 93 Mo. 606; State v. Binder, 38 Mo. 450; Opinion of the Judges

on Township Organization Law, 55 Mo. 295; Ex parte Swann, 96 Mo. 44; State v. Moore, 107 Mo. 78; State v. Searcy, 111 Mo. 236; State v. Watts, 111 Mo. 553 and State v. Wingfield, 115 Mo. 428, are correct and have firmly imbedded the principles therein stated in the body of our laws, but that the act under consideration is void, because it violates section 7 of article 9 of the Constitution, which requires the General Assembly to divide the cities of the State into four classes, and to prescribe the power of each class by general law, "so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions," in this, that if some of the cities of a class elect to exercise the powers conferred by the act and others of the same class do not, then all of the cities of the same class will not possess the same powers and be subject to the same restrictions, but that a fifth class of cities, to wit, those that exercise the powers conferred by the act, will be created, while that section says there shall only be four classes of cities.

It is easy to demonstrate that such a contention is absolutely untenable for the following reasons:

First: Because the act confers the same powers and imposes the same restrictions upon all cities named in the act. It is only a question of whether one or all of such cities choose to exercise the powers granted. If only one so chooses, it does not detract from the right or power of the others to do so. And as is pointed out in the Maggard-Pond case, and in all the other cases, whether one does and others do not exercise the powers conferred does not make the law unconstitutional, does not make the law any the less a general law, does not make the act any the less a complete law when it left the hands of the legislature; and the act of the city does not *create* the law, but the law creates the right. If this contention is true, then the same objection, for the same reason, would apply to the whole of chapter 30, Revised

Statutes 1889, for that is the body of our laws which confers power upon cities to exist, to make local regulations, impose taxes, license, tax and regulate occupations, improve streets, erect public buildings and make public improvements. The power is conferred, but it is left to each city to exercise the powers or not as it may elect, and in some instances the power to elect is conferred upon designated corporate officers, and in other instances the officers are prohibited to act without the consent of the people, just as is the case under the act now under consideration. But no lawyer would risk his reputation by saying that if one of the cities of a class exercised any of the powers so granted and the other cities of the same class did not do so, that the law violated section 7 of article 9 or that it created a fifth class of cities. The same is precisely true of this act.

Second: The use of the words: "So that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions," employed in section 7 of article 9, adds no force whatever to the requirement of that section that: "The General Assembly shall provide, by *general laws*, for the organization and classification of cities and towns ....... the power of each class shall be defined by *general laws*." If the powers of each class can only be defined by *general laws* then it follows as a legal conclusion that each city of the same class will have the same powers and be subject to the same restrictions, for this is exactly the effect of a *general law*, and so the addition of these words leaves the act in the same legal shape as if it had simply said, the General Assembly shall provide, by general laws, for the organization and classification of cities into four classes and shall provide, by general laws, charters for their government. Section 7 of article 9 therefore makes no difference whatever when considering local option laws except to restrict such enactments so that each class of cities shall have the same powers, and this they have under this act.

Third: It is impossible to subscribe to the Maggard-Pond case, and at the same time hold this act unconstitutional on the ground that it conflicts with section 7 of article 9. The act under consideration in the Maggard-Pond case, was passed April 5, 1887. This was after the adoption of section 7 of article 9 of the Constitution, and after the passage of the Cities, Towns and Villages Act (Laws 1877, p. 42), which divided the cities of the State into four classes, as follows: 1st class, cities of 100,000 or more; 2d class, cities of over 20,000 and less than 100,000 inhabitants; 3d class, cities of over 5,000 and less than 20,000 inhabitants; and 4th class, cities of over 500 and less than 5,000 inhabitants. The act of 1887, construed in the Maggard-Pond case related to counties and to cities of 2,500 inhabitants or more. Cities of 2,500 inhabitants belonged to the 4th class of cities as the law then was. Therefore the act held valid in the Maggard-Pond case violated section 7 of article 9, in this, that it did not confer the same power upon all of the cities of the 4th class, but on the contrary conferred upon all cities of that class that had over 2,500 and less than 5,000 inhabitants, the power to authorize the sale of liquor therein, but did not confer any such local option upon cities of the fourth class that had over 500 and less than 2,500 inhabitants. This clearly split cities of the fourth class into two classes. Yet that act was held to be good, and this contention subscribes to the correctness of that decision. Whereas, no such condition is present in the act of 1893, here under consideration, for it confers the same power upon every city of the classes specified. Yet it is said this act violates section 7 of article 9. This exposition should forever settle this contention.

State v. Binder, 38 Mo. 450, was decided in 1866, long before section 7 of article 9, Constitution 1875, was adopted, and construed an act authorizing municipal corporations in St. Louis county to authorize, by a vote of the people, the sale of liquors, on Sunday, when the laws of the State made it

a crime to do so. This case has no application to this contention. The Opinion of the Judges on the Township Organization Law, 55 Mo. 295, was given in 1874, when the constitution of 1865 was in force and under that constitution the General Assembly had power to create cities and grant their charters by a special act, and there is no such restriction as section 7 of article 9 provides. That opinion related to a law—a complete law—which gave power to create township organizations but left it to the vote of the people of each locality, whether they would or would not exercise the power conferred. This case is an authority in favor of the validity of the act under consideration. Ex parte Swann, 96 Mo. 44, construed the same local option law of 1887, that was passed on in the Maggard-Pond case. The same is true of State v. Moore, 107 Mo. 78; State v. Searcy, 111 Mo. 236; State v. Watts, 111 Mo. 553, and State v. Wingfield, 115 Mo. 428. And if the contention here set up is correct all those cases were erroneously decided. In fact for the reasons hereinbefore given, especially the third in this connection, those cases may be said to have been improperly decided so far as the act of 1887 relates to cities of the fourth class, but the same reasoning necessarily decides that the act now under consideration is valid, and the reasoning of both the majority and minority opinions in the Maggard-Pond case leads to the inevitable conclusion that this act is valid.

The Constitution of Colorado (section 13 and 14 of article 14) contains a provision which is exactly like section 7 of article 9 of our Constitution, and this provision has been construed by the Supreme Court of that State in Brown v. City of Denver, 7 Colo. 305; Carpenter v. People, 8 Colo. l. c. 124; Darrow v. People, 8 Colo. 426; Rogers v. People, 9 Colo. 454; People ex rel. v. Fleming, 10 Colo. 553. A review of these cases can not be made in the limits of this, already, voluminous opinion, but it is profitable to note the statement in Rogers v. People, 9 Colo. l. c. 454, in speaking

of this constitutional provision: "This provision clearly authorizes the granting of different powers and different restrictions to the different classes of municipal corporations mentioned. And there is clear constitutional authority for bestowing upon one class, within certain limits, exclusive legislative control over a given subject pertaining to local self-government, while another class is allowed only concurrent power in connection therewith."

The Constitution of Kentucky (section 156), of Wyoming (section 1, art. 13), and of South Dakota (section 1, art. 10) contain also provisions similar to section 7 of article 9 of our Constitution. In none of these states, however, have I been able to find any decision which construes that constitutional provision, as it is here contended for.

It is claimed, however, that the proceedings of the constitutional convention of 1875, from which liberal quotations have been herein made, as stated by Judge Cooley, in his work on Constitutional Limitations (6 Ed., p. 81), "are less conclusive of the proper construction of the instrument than are legislative proceedings of the proper construction of a statute; since in the latter case, it is the intent of the legislature we seek, while in the former we are endeavoring to arrive at the intent of the people through the discussions and deliberations of their representatives."

But while it is true the framers of the Constitution only proposed while the people adopted the Constitution, nevertheless the people gave, and could, in the nature of things, give, no reason for adopting it, or keep any record thereof. They each acted on his own understanding of the meaning of the terms employed in the Constitution. But they acted in the light of current events and had the benefit of the reasons given by the proposers of the Constitution for submitting the terms employed in that instrument, and hence it violates no rule of construction for the courts to seek all the light the people had when they acted. Every student of law is

taught "The Federalist," yet that book consists only of newspaper articles written by Mr. Hamilton, Mr. Madison and Mr. Jay, giving their interpretation of the meaning of the proposed Constitution of the United States, and reference is therein freely made to the debates of the constitutional convention for light upon the true meaning of the proposed provisions. So too "Elliott's Debates on the Federal Constitution" and "The Madison Papers, Containing Debates on the Confederation and Constitution," are freely referred to and relied on by courts and statesmen and searchers after the truth. In State of Rhode Island v. State of Massachusetts, 12 Pet. l. c. 721, the Supreme Court of the United States said: "Our next inquiry will be, whether we have jurisdiction of the subject matters of the suit, to hear and determine them. That it is a controversy between two States, can not be denied; and though the Constitution does not, in terms, extend the judicial power to all controversies between two or more States, yet it in terms excludes none, whatever may be their nature or subject. It is, therefore, a question of construction, whether the controversy in the present case is within the grant of judicial power. The solution of this question must necessarily depend upon the words of the Constitution; the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions of the people of and in the several States, together with a reference to such sources of judicial information as are resorted to by all courts in construing statutes, and to which this court has always resorted in construing the Constitution."

No apology is needed or offered, therefore, for the references herein made to the proceedings of the Constitutional Convention of 1875.

Lastly, it is said that sections 2, 3, 4, 7, 9, 16, 20 to 23 of article 9 and section 12 of article 10 specify when the people of a locality shall have a right to vote on a question of the adoption of a law, and that upon the principle of *ex-*

*pressio unius*, etc., they can not vote upon any other question. Section 2 relates to removing a county seat. Section 3 relates to establishing new counties and dividing existing counties. Section 4 relates to striking off a part of one county and adding to it another county. Section 7 relates to cities, and authorizes cities holding special charters to come in under the general laws relating to cities. Section 16 authorizes cities having 100,000 or over to frame their own charters. Section 20 to 23 authorizes the city of St. Louis to frame its own charter. And section 12 of article 10 prohibits any county or city, town, township, school district or other political subdivision of the State from becoming indebted in any year to an amount exceeding the income or revenue provided for that year, without the assent of two-thirds of the voters thereof.

But it is evident that in all such cases, it is the vote of the people which *creates* the thing to be done, or the right to be exercised. While here, the right and power is created by the Legislature, and the constituted authorities of the city, town or county or the people thereof only exercise the power already granted. If this was not so, then there would be no city or town or township or school district; for all such spring into existence by virtue of the will of the people deciding to exercise or take advantage of a power already completely granted, and in the same manner the people under this act only exercise or rather the locality, with the consent of the people, exercises the power conferred by the State. This act is complete. It needs no adoption or ratification by the people. The cities and the people exercise the powers conferred, but they create no law, nor do they breathe life into the act. The statute has provided the power and the machinery, the locality and the people simply put the machinery in motion. For this reason this act does not fall within the objection made that the people are required or authorized to vote upon a subject not specially reserved by the Constitution to their decision, but on the contrary vested in another body. If the

act in question so offended, it should be held void. But if it does not do so, it is valid and constitutional.

For these voluminous, and I trust somewhat luminous reasons, I think the judgment of the circuit court should be reversed and the cause remanded to that court with directions to dismiss the bill.

*Brace, J.*, concurs in the VI paragraph. *Gantt, C. J., Robinson* and *Valliant, JJ.*, express their views in a separate opinion by *Gantt, C. J. Sherwood* and *Burgess, JJ.*, express their views in a separate opinion by *Sherwood, J.*

It is therefore ordered by the court that the judgment of the circuit court be affirmed.